## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CROSSBORDER SOLUTIONS, INC. and CROSS BORDER TRANSACTIONS, LLC d/b/a CROSSBORDER SOLUTIONS,<br><br>        Plaintiffs,<br><br>        -against-<br><br>MACIAS, GINI & O'CONNELL, LLP and SANJAY AGARWAL,<br><br>        Defendants. | Case No. 20-cv-4877(NSR)<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiffs CrossBorder Solutions, Inc. and Cross Border Transactions, LLC *d/b/a* CrossBorder Solutions (collectively, "CrossBorder" or the "Company"), by and through its undersigned counsel, for their Second Amended Complaint[1] against Defendants Macias, Gini & O'Connell LLP ("MGO") and Sanjay Agarwal ("Agarwal") (collectively, "Defendants"), allege as follows:

### NATURE OF THE ACTION

1.      This action seeks permanent injunctive relief against Defendants to remedy the carefully orchestrated theft of CrossBorder's trade secrets and confidential and proprietary information by three former employees—Liga Hoy ("Hoy"), Jiaxin "Claire" Song ("Song") and Lijun "Maggie" Tian (collectively, the "Former Employees").[2]

---

[1] Plaintiffs hereby amend their Amended Complaint (Dkt. No. 34) pursuant to Fed. R. Civ. P. 15(a)(2) and the Court's February 23, 2022 Order (Dkt. No. 154).

[2] Tian was voluntarily dismissed from this action on August 26, 2020, following the termination of her employment by Defendant MGO.  Dkt. No. 69. Hoy and Song were voluntarily dismissed from this action on November 9, 2021, following the conclusion of the arbitration proceeding *CrossBorder Solutions, Inc., et al. vs. Hoy, Liga, et al.*, JAMS Reference No. 1425032780, between CrossBorder and Hoy and Song, with the arbitrator issuing an Award. Dkt. No.

2.      This action also seeks money damages against (1) Defendant MGO, the former employer of the Former Employees, and (2) Defendant Agarwal, MGO's Tax Services Leader and Silicon Valley Office Managing Partner during the relevant period.  As detailed below, MGO and Agarwal encouraged and facilitated the theft of CrossBorder's trade secrets and confidential and proprietary information, and then repeatedly used CrossBorder's stolen trade secrets and confidential and proprietary information to advance their own business interests, while tortiously interfering with the Former Employees' employment agreements with CrossBorder (the "Employment Agreements").

3.      CrossBorder is a global leader in providing technology-driven tax solutions to companies through cutting-edge transfer pricing software.  Following the expenditure of hundreds of thousands of hours and over $20 million to develop its technology and customer base, CrossBorder successfully created a niche market for such transfer pricing services, competing effectively with the world's leading accounting firms.  MGO is a much less successful competitor in this same space.

4.      As part and parcel of their prior employment at CrossBorder, the Former Employees were afforded access to highly confidential CrossBorder customer-related information. This included, for example, CrossBorder's master list of its approximately 500 clients, including client contact names, email addresses and phone numbers (the "Master List"), as well as CrossBorder client work product; client proposals; signed engagements, detailed information about client current and future needs; client internal corporate structures; and prospect lists (collectively, "Confidential Information").

---

150. Hoy and Song acknowledge that, notwithstanding their dismissal from this action, they continue to be bound by the permanent injunction entered against them (Dkt. No. 145), and remain subject to the jurisdiction of this Court for enforcement of that permanent injunction.

5.      The Master List details the following for each of CrossBorder's clients: the client name, the lead CrossBorder employee, the client's industry focus, the client's country and location, the term and date of CrossBorder's contract with the client, the estimated expiration date of the contract, primary and secondary contacts at the client with phone numbers and email addresses for each, notes about the client's satisfaction with CrossBorder, the potential for upsell opportunities, and the first install date of CrossBorder's work.  The Master List also contains the dollar values of CrossBorder's relationship with each of its clients, as well as information from which the pricing of CrossBorder's contract with each client could be derived.

6.      Months prior to the termination of her employment from CrossBorder, Hoy had already begun orchestrating a group defection from CrossBorder, with Song and Tian.  Even while still employed by CrossBorder, Hoy, on numerous occasions, unlawfully solicited CrossBorder employees to leave CrossBorder with her.

7.      When CrossBorder discovered that Hoy was soliciting CrossBorder employees to leave the Company with her, her employment was terminated.  That very same day, Hoy then quickly accessed CrossBorder's client lists, downloaded CrossBorder Confidential Information to a personal drive, and thereafter had Song and Tian collect even more.

8.      Hoy thereafter unlawfully solicited Song and Tian to breach their Employment Agreements with CrossBorder and join her at her new employer, Defendant MGO, a direct competitor.

9.      Knowing that those solicitation actions violated her own CrossBorder Employment Agreement, Hoy instructed Song and Tian to apply to MGO through a generic online application. Song and Tian then did just that, ultimately resigning from CrossBorder to join MGO at Hoy's urging.

3

10.     During Tian's pre-hire interview with Defendant Agarwal of MGO, Tian expressed specific concerns to Defendant Agarwal about her contractual non-competition obligations to CrossBorder.  She was expressly told by Defendant Agarwal not to worry about that restrictive covenant in her Employment Agreement with CrossBorder, that MGO's team of attorneys would "have her back," and that she should do everything she could to help develop business for MGO.

11.     Even before she joined MGO, Tian acted as an undercover agent for Hoy, Agarwal and MGO, conveying CrossBorder Confidential Information to Hoy, at her request, and downloading CrossBorder Confidential Material, including the Master List, for future use by Hoy, Agarwal and MGO.

12.     Following Tian's departure from CrossBorder, and on her second day of employment at MGO, Hoy asked Tian for the CrossBorder Master List, for use during an MGO business development meeting with Agarwal and senior management the next day.  Tian emailed Hoy that Master List, using the MGO email system.

13.     Upon information and belief, Hoy then relayed information from the Master List to Agarwal and MGO's business development team, who used that stolen information specifically to create a prime target list comprised of those companies whose contracts with CrossBorder were expiring — i.e., the companies most readily susceptible to being converted into MGO clients.

14.     Before joining MGO and while still employed by CrossBorder, Song likewise acted as a spy for Hoy and MGO, relaying CrossBorder Confidential Information upon Hoy's request for use by Defendants Hoy, Agarwal and MGO.

15.     Armed with detailed knowledge of CrossBorder's entire client base, Hoy and Song and Defendants Agarwal and MGO then went on a CrossBorder client solicitation binge — ultimately soliciting over 200 CrossBorder clients, or more than 40% of CrossBorder's client base,

seeking to have them end their relationship with CrossBorder and switch to MGO. This included sending a mass invitation to an MGO transfer pricing client seminar.

16. These actions, based entirely on the stolen CrossBorder trade secrets and Confidential Information, threatened disastrous consequences for CrossBorder, with the potential to decimate its customer base and sales pipeline.

17. Therefore, to preserve the status quo, and prevent the deliberate destruction of its core business, CrossBorder sought, and secured from this Court, immediate injunctive relief: (1) enjoining Hoy, Song and Tian, and all persons acting in concert with or through them who receive actual notice of the injunction, from disclosing or using CrossBorder Confidential Information; (2) enjoining Hoy, Song and Tian from breaching their confidentiality obligations contained in their respective Employment Agreements with CrossBorder; (3) enjoining Song and Tian from breaching their non-solicitation and non-competition contractual obligations contained in their Employment Agreements with CrossBorder with respect to all clients and potential future clients on CrossBorder's customer or prospect lists; (4) enjoining Hoy, and all persons acting in concert with or through her who receive actual notice of the injunction, from tortiously interfering with Song and Tian's Employment Agreements with CrossBorder and with any other CrossBorder employees' contracts with CrossBorder.

18. That immediate injunctive relief (Dkt. No. 23) was thereafter extended by the Court into a preliminary injunction (Dkt. No. 56) for the duration of the JAMS arbitration against the Former Employees, and counsel for Defendant MGO agreed that it was covered by said preliminary injunction for the duration of this action and then, upon stipulation, converted into a permanent injunction (Dkt. Nos. 140, 145) against the Former Employees.

19.     CrossBorder also seeks money damages from Defendants Agarwal and MGO, for their knowing and willful misappropriation of CrossBorder's Confidential Information and continuing tortious interference with Hoy, Tian and Song's Employment Agreements with CrossBorder.

## PARTIES

20.     Plaintiff CrossBorder Solutions, Inc. is a Delaware corporation with its principal place of business in Tarrytown, New York.  It is a global leader in providing technology-driven tax solutions through cutting-edge transfer pricing software, from its physical offices in Tarrytown, New York; New York City; London; and Argentina; and through employees working remotely elsewhere.  CrossBorder Solutions, Inc. is the parent company of Plaintiff Cross Border Transactions, LLC.

21.     Plaintiff Cross Border Transactions, LLC *d/b/a* CrossBorder Solutions is a Delaware limited liability company with its principal place of business in Tarrytown, New York. Cross Border Transactions, LLC, a subsidiary of Plaintiff CrossBorder Solutions, Inc., was the former employer of Hoy, Song and Tian.

22.     Defendant MGO is a limited liability partnership organized and existing under the laws of the State of California, with its principal place of business in Sacramento, California, and with offices in many parts of the country, including multiple offices in New York.

23.     Upon information and belief, Defendant Sanjay Agarwal is a resident of California, where he was MGO's Leader of Tax Services as well as the Office Managing Partner of Defendant MGO's Silicon Valley office during the relevant period.

## JURISDICTION AND VENUE

24.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because the action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*

25.    The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

26.    This Court has personal jurisdiction over Defendants pursuant to CPLR § 302(a)(1)-(3) because Defendants Agarwal and MGO each transacted business within the State of New York and each committed tortious acts within the State of New York that caused injury to Plaintiffs in New York.

27.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred within this judicial district.

## FACTUAL ALLEGATIONS

### CrossBorder's Business

28.    Founded in 2016, CrossBorder is now a global leader in technology-driven tax solutions that have taken the accounting industry by storm.  CrossBorder produces and licenses its computer software "as a service."  That software uses proprietary artificial intelligence and a cloud-based user interface to help businesses maximize their tax efficiency through transfer pricing compliance mechanisms.

29.    Transfer pricing refers to the rules and methods for pricing transactions within and between businesses under common ownership or control, such as between subsidiary and parent entities.  CrossBorder has achieved a breakthrough for clients in transfer pricing compliance

through a cloud-based software platform that relies on artificial intelligence to conduct hyper-localized studies to anticipate tax audits and prevent adjustments and penalties.

30.     These transfer pricing accounting techniques benefit only a very limited clientele. A small percentage of companies throughout the world have a need for transfer pricing services like those offered by CrossBorder and its competitors.  Finding those companies is therefore akin to finding the proverbial needle in a haystack.

31.     CrossBorder's innovative techniques therefore must be coupled with strategic sales strategies to build a market for such transfer pricing accounting services.

32.     CrossBorder must spend significant time, effort and money to identify its prospects and customers.  The Company employed 45 people full time who work solely on identifying clients and selling software and services to that discrete market.  CrossBorder's marketing team made approximately 5,000 phone calls per day, or 100,000 calls per month, to identify, on average, just 50 new customers per month.

33.     CrossBorder's sales and marketing operations cost the Company approximately $750,000 per month.

34.     In total, CrossBorder has expended over $20 million to develop its technology and customer base.

35.     CrossBorder's customer and prospect lists cannot be obtained through publicly available sources.  They are the end result of the Company's specialized knowledge of the industry and sophisticated marketing efforts. CrossBorder maintains its current list of clients on the Master List, which is shared with certain CrossBorder employees to facilitate their sales and client servicing activities.

8

36.     CrossBorder undertakes considerable efforts to maintain the secrecy of its Confidential Information, including but not limited to, restricting access to the Confidential Information only to certain personnel, storing the Confidential Information on encrypted drives, and having its employees agree to confidentiality, non-compete and non-solicit restrictive covenants.

37.     CrossBorder also provides its employees with Company-issued laptops and mobile phone technology to further protect its Confidential Information.

**The Former Employees Join CrossBorder**

38.     Hoy first began working for CrossBorder on September 17, 2018 as a Senior Economist.  She was previously self-employed, trying to create her own consulting company that specialized in transfer pricing compliance.  She was unable, however, to identify sufficient clients to build that business.

39.     In her role as Senior Economist at CrossBorder, Hoy was the most senior industry expert at the Company and the most senior manager on client projects.  She was responsible for managing client relationships, supervising a team of analysts, and approving final work product.  Furthermore, shortly before her employment was terminated, she had been given responsibility for the Company's entire client base, rather than just a subset.

40.     As part of her Senior Economist role, Hoy regularly provided clients sophisticated tax advice.  She also played a large role in the Company's sales efforts, solidifying the Company's relationships with prospects, and identifying upselling opportunities with existing clients.

41.     While working for CrossBorder, Hoy made monthly visits to CrossBorder's Tarrytown, New York Office, where she would regularly meet with her team, which included Song and Tian, and with CrossBorder senior executives.

42.     Tian was hired by CrossBorder on September 13, 2018 and began working for CrossBorder on September 17, 2018, as a Transfer Pricing Manager in CrossBorder's Tarrytown, New York office.  Tian was later promoted to Bookend Manager.  In that role, Tian worked directly with clients and completed client work product, while supervising junior and senior analysts.  Tian also assisted with sales efforts by speaking with sales prospects.

43.     Song began working for CrossBorder on or around March 20, 2018 as a Transfer Pricing Senior Analyst in CrossBorder's Tarrytown, New York office.  Song was later promoted to Manager.  In that role, Song worked directly with clients and completed client work product while supervising junior analysts.

**The Former Employees' Employment Agreements**

44.     As a condition of each of their employment at CrossBorder, the Former Employees each entered into Employment Agreements with CrossBorder, dated September 11, 2018, March 20, 2018 and September 12, 2018, respectively (attached hereto as Exhibits A.1-A.3).  In their Employment Agreements, the Former Employees each agreed, *inter alia*, to the provisions detailed below regarding confidentiality, non-solicitation and non-competition obligations, both during and after their employment at CrossBorder. The three Employment Agreements are identical in these respects.

45.     *First,* the Former Employees "acknowledged and agree[d]" in their respective Employment Agreements that their "employment necessitates access to and knowledge of confidential information that is proprietary to and/or a trade secret of the Company,"   the disclosure of which an "existing or potential competitor would place the Company at a competitive disadvantage and [] damage the Company's business." Employment Agreements § 6.  The Former

Employees further agreed to maintain CrossBorder's non-public information confidential "during [their] employment and thereafter," specifically agreeing not to:

> [U]se such information for your own benefit or to reveal, report, publish, disclose or transfer, directly or indirectly, any Confidential Information to any person or entity, or to utilize any Confidential Information for any purpose, except in the course of your work for the Company.

*Id.* § 6(b).

46.    CrossBorder's confidential information is, in turn, defined to include:

> [C]ustomer lists, lists of prospective customers and acquisition targets, marketing and business plans, business or technical needs of customers, consultants, licensees or suppliers and their methods of doing business, arrangements with customers . . . .

*Id.*

47.    *Second*, the Former Employees agreed in their Employment Agreements that, during their employment at CrossBorder and for two years following termination of their employment, they would not:

> (a) . . . directly or indirectly, solicit or hire any employee of the Company or its affiliates or induce any employee of the Company or its affiliates to leave the Company.
>
> (b) . . . directly or indirectly, solicit the business of any customer or potential customer or persuade any customer or potential customer to cease doing business with CrossBorder.

*Id.* § 7(a)-(b).

48.    *Third,* the Former Employees agreed in their Employment Agreements that, during their employment at CrossBorder and for one year thereafter, they would not be "involve[d] (whether as an employee, proprietor, consultant, director, officer, member, owner, partner or otherwise) with any person or entity (including any company together with its affiliates) engaged in any business activity which is materially competitive with the Company . . . ." *Id.* § 8.

11

49.    In Section 8 of the Employment Agreements, the Former Employees agreed that these restrictive covenants were "reasonable and necessary to protect and preserve the interests, properties, and business of the Company, and that irreparable loss and damage will be suffered by the Company should [they] breach any of such covenants." *Id.*

50.    The Employment Agreements also provided that, in the event of a breach of the restrictive covenants, CrossBorder could enforce them specifically by injunction "without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security." *Id.* § 10.

**Hoy Solicits CrossBorder Employees to Leave CrossBorder and Takes CrossBorder Confidential Information After Her Employment is Terminated**

51.    Throughout their employment at CrossBorder, the Former Employees had wide access to CrossBorder Confidential Information — including but not limited to the Master List of CrossBorder's clients; CrossBorder's client work product, client proposals, prospect proposals; lists of potential future clients; and information about client current and future needs.  The Former Employees' roles with the Company necessitated their access to this Confidential Information.

52.    As part of its contracts with clients, CrossBorder serves as a comprehensive transfer pricing advisor to its clients, and also provides its clients with consulting services in areas outside its core business of transfer pricing compliance.  CrossBorder employees, including Hoy, were expected to provide these ancillary services to clients upon request.

53.    Before November 2019, the Company charged clients for these ancillary projects, termed "upsell" work.  The Company stopped separately charging clients for upsell work in November 2019 when it adjusted its license pricing and terms.

54.    Upon information and belief, during the second half of 2019, the Former Employees began discussing building their own consulting company.  Upon information and

belief, Hoy also began specifically identifying CrossBorder clients who presented upsell opportunities for paid consulting work.

55.     Upon information and belief, Hoy then solicited certain specific clients for upsell work by creating her own proposals outside of the Company's normal sales process, without Company approval or knowledge.  When the Company learned of this unauthorized activity, Hoy was reprimanded.

56.     In November 2019, Hoy took Song, Tian and a third CrossBorder employee, Daniel Sohn, out to dinner and further solicited them to create their own business.

57.     On December 18, 2019, CrossBorder distributed a memo to its employees explaining that the Company was restructuring its internal transfer pricing practices so that the most senior transfer pricing experts in the Company would no longer each be solely responsible for a specific group of clients but, instead, would be responsible for scoping the client engagement, and reviewing and delivering final work product, for all CrossBorder clients.

58.     Following receipt of that memo, Hoy actively began planning her departure from CrossBorder.  The very next day, December 19, 2019, she apparently began visiting job recruiter websites.

59.     Over the next month, Hoy repeatedly accessed CrossBorder Confidential Information, including CrossBorder client lists.  She also viewed documents detailing Song and Tian's "pipeline" of potential clients.

60.     On January 15, 2020, Hoy again took Song, Tian and Mr. Sohn out to dinner in Tarrytown, New York, and expressly encouraged them to leave CrossBorder with her.

61.    When CrossBorder senior management learned that Hoy was soliciting CrossBorder employees to leave the Company, that prompted a decision to terminate Hoy's employment the next time she was in the New York office.

62.    On January 17, 2020, Hoy's employment with CrossBorder was terminated in CrossBorder's New York, New York office.

63.    Before she left the building that date, and immediately after her termination, Hoy rushed to her work-station, in the presence of another Company executive, accessed a CrossBorder file called "Upsell Opportunities" and downloaded it onto a personal thumb drive, together with other documents regarding Company clients. That Upsell Opportunities file, upon information and belief, included consulting work opportunities obtained by CrossBorder that Hoy sought to thereafter monetize for her own personal economic gain.

64.    Upon information and belief, on January 27, 2020 Hoy reached out to Song and Mr. Sohn, asking them for a picture of the December 18, 2019 memorandum regarding CrossBorder's internal restructuring. Hoy stated via text message that the purpose of her request was to determine whether CrossBorder's decision to take away her direct client ownership for certain clients enabled her to now solicit such clients for business, as she had an opportunity with a CrossBorder competitor. Hoy expressly noted in her text messages that there were Manager positions in New York as well for Song.

65.    Hoy knew that her request was improper, specifically stating in the same text message to Song and Mr. Sohn that she "understood" if they felt uncomfortable with providing her a picture of the memo.

66.    Hoy ultimately obtained a picture of the memo.

**Hoy Joins MGO and, With Defendants Agarwal and MGO's Assistance, Successfully Solicits Song and Tian to Defect to MGO and to Misappropriate CrossBorder Confidential Information for MGO's Benefit**

67.     In or around March 15, 2020, Hoy called Tian to inform her that she was joining MGO and that she would be building a team to handle transfer pricing assignments.  Hoy solicited Tian to join her team at MGO.

68.     Upon information and belief, in or around March 17, 2020, Hoy began working for MGO as Leader of National Transfer Pricing and Managing Director of Tax Practice.

69.     That same day, Hoy called Tian and told Tian that MGO would offer $40,000 more in salary than her current salary at CrossBorder if Tian were to leave CrossBorder and join Hoy's team at MGO.

70.     Upon information and belief, around this time, Hoy also solicited Song to leave CrossBorder and join MGO.

71.     Hoy expressly instructed Song and Tian to apply to MGO online and to communicate directly with Defendant Agarwal, so as to make it look like Hoy was not recruiting them away from CrossBorder.

72.     Around this time, Tian and Hoy also discussed Tian's access to CrossBorder's Master List.  Hoy told Tian to be careful when taking the Master List and instructed Tian not to download it onto a thumb drive, because CrossBorder would discover the download.

73.     Tian applied online for employment with MGO on March 22, 2020, and thereafter interviewed for a position at Defendant MGO with Defendant Agarwal on March 27, 2020.  Song followed suit shortly thereafter.

74.     Upon information and belief, Defendants Agarwal and MGO's intent in hiring Hoy, Song and Tian was to build a transfer pricing practice around them and their CrossBorder clients.

75.    During Tian's interview, Defendant Agarwal expressly told Tian that she could bring her clients over to MGO.  When Tian expressed a concern about the non-competition obligation in her Employment Agreement with CrossBorder, Defendant Agarwal told Tian not to worry about the restrictions in her Employment Agreement, because MGO's team of lawyers would "have her back."

76.    At that time, upon information and belief, Defendant Agarwal was aware of the restrictions in Tian's Employment Agreement with CrossBorder because he had seen Hoy's essentially identical Employment Agreement with CrossBorder.

77.    During that same interview, Defendant Agarwal specifically instructed Tian to do whatever she could to develop business for MGO.

78.    At the end of the interview, Defendant Agarwal orally extended to Tian an offer of employment at MGO, and Tian orally accepted that offer.

79.    Three days later, on March 30, 2020, Tian downloaded, onto a personal thumb drive, a number of files containing CrossBorder Confidential Information for future use by Hoy and Defendants Agarwal and MGO, including: (i) the Master List; (ii) an iteration of the Master List that showed which CrossBorder employee was assigned to manage client relations for each of approximately 500 CrossBorder clients; (iii) an iteration of the Master List that detailed the status of client engagements for approximately 500 CrossBorder clients, as well as which CrossBorder employee was assigned to manage client relations for each CrossBorder client, and the client deliverables scheduled for March and April 2020; and (iv) transfer pricing work product created by CrossBorder for a CrossBorder client.  On or around that same day, Tian also printed out physical copies of numerous transfer pricing reports previously completed for CrossBorder clients.

80.     On March 31, 2020, Tian received a formal written employment offer from MGO. Tian formally accepted MGO's offer of employment on April 1, 2020. That very same day, Tian tendered her resignation to CrossBorder.

81.     CrossBorder asked Tian to stay at CrossBorder for two weeks, until April 15, 2020, to transition her work to other employees, and Tian agreed to do so.

82.     Around this time, Hoy also told Tian that she should do anything possible to develop business for Defendant MGO, including bringing CrossBorder clients to MGO, and that MGO's legal team would support her. Upon information and belief, Hoy repeated this same mantra to Song about doing anything she could to develop business, including bringing CrossBorder clients to MGO.

83.     Over the next two weeks, after Tian had accepted a position with MGO, but while she was still employed by CrossBorder, Hoy solicited Tian on numerous occasions to provide her with CrossBorder Confidential Information for use by her and Defendant MGO.

84.     Tian provided that Confidential Information to Hoy, at her request, by telephone and through a series of screenshots she sent to Hoy, via text messages showing communications with various CrossBorder clients.

85.     Tian's last day of employment at CrossBorder was April 15, 2020. The next day, April 16, 2020, Tian began working for MGO.

86.     On April 17, 2020, Tian's second day of employment at MGO, Hoy asked Tian for the CrossBorder Master List, so that Hoy could use it the next day in an upcoming business development meeting with MGO senior management, including Defendant Agarwal.

87.     Tian obliged, sending the Master List to Hoy by e-mail, with Hoy and Tian using their respective MGO e-mail accounts to transfer this stolen property.

88.     Hoy then, upon information and belief, shared portions of the CrossBorder Master List with Defendant Agarwal, who then shared it with Juline Cohen, another MGO employee.

89.     MGO specifically culled from the Master List those clients whose contracts with CrossBorder were soon to expire, making them prime targets for MGO's business development team.  Those client names were, upon information and belief, assembled into a prime target list by Hoy and Defendant Agarwal, working together with Ms. Cohen.

90.     During this same time, Hoy continued to solicit Song, who was still employed by CrossBorder, for CrossBorder Confidential Information, including the names and contacts of Song's clients at CrossBorder.

91.     Upon information and belief, Song readily obliged and sent CrossBorder Confidential Information to Hoy, expecting Hoy to act upon such information to solicit business for Defendant MGO.

92.     Song resigned from CrossBorder on June 9, 2020 and, shortly thereafter, was hired by MGO in its transfer pricing practice.

**Defendant MGO Uses CrossBorder Confidential Information to Contact CrossBorder Clients and Solicit Their Business**

93.     Armed with extensive CrossBorder Confidential Information, Hoy and Defendants Agarwal and MGO began actively contacting CrossBorder clients to solicit business on behalf of MGO.

94.     Through e-mails sent by Hoy, Agarwal, Ms. Cohen and Tian, MGO contacted over 200 such CrossBorder clients, soliciting their business for MGO.

95.     At the instruction of Hoy and Defendants Agarwal and MGO, Tian personally e-mailed 18 CrossBorder clients to solicit business for MGO.

96.    Using CrossBorder Confidential Information, Defendant MGO, acting through Hoy and Defendant Agarwal, ultimately held follow up calls with at least four CrossBorder clients, and sent formal work proposals to at least three such CrossBorder clients.

**CrossBorder Learns of Defendants' Misconduct and Commences this Action**

97.    As early as February 14, 2020, CrossBorder sent a letter to Hoy demanding that she immediately return all CrossBorder property in her possession, including any customer lists, customer contact information, the Upsell Opportunities files and any customer proposals. CrossBorder further demanded that Hoy refrain and immediately cease and desist from any usage or disclosure of CrossBorder's confidential, proprietary and/or trade secret information.

98.    While Hoy never returned any of the property she misappropriated from CrossBorder, there was no indication at that time that Hoy was soliciting CrossBorder employees to leave or soliciting CrossBorder clients for business.

99.    On June 18, 2020, however, a CrossBorder client informed CrossBorder that Hoy and Tian, while working for MGO, had repeatedly contacted that client to solicit its business.  The client also informed CrossBorder that it had received a communication from MGO announcing Hoy and Song's arrival at MGO.

100.    After learning from that customer that Hoy and Song and Defendants had solicited their business, CrossBorder sent cease and desist letters to Defendant MGO, and to Hoy, Song, and Tian, on or about June 19, 2020.

101.    In those letters, CrossBorder demanded that they each cease and desist from using CrossBorder's confidential, proprietary and/or trade secret information.  With respect to the Former Employees, CrossBorder further demanded that they honor their contractual obligations with CrossBorder and confirm in writing that they were doing so.

102.    With respect to Hoy and Defendant MGO, CrossBorder also demanded that they immediately desist from further tortiously interfering with Song and Tian's ongoing contractual obligations to CrossBorder, specifically their confidentiality, non-competition and non-solicitation obligations.

103.    When the June 19th cease and desist letters generated no substantive responses, nor any of the written assurances requested, this action followed.

104.    On June 26, 2020, the Court entered a Temporary Restraining Order (the "TRO") prohibiting:

- "Hoy, Song and Tian, and all persons acting in concert with or through them who receive actual notice of th[e] Order . . . from disclosing or using CrossBorder Confidential Information";

- "Hoy, Song and Tian . . . from breaching their confidentiality obligations contained in their respective Employment Agreements with CrossBorder";

- "Song and Tian . . . from breaching their non-solicitation and non-competition contractual obligations contained in their respective Employment Agreements with CrossBorder with respect to all customers and potential future customers on CrossBorder's customer or prospect lists"; and

- "Hoy, and all persons acting in concert with or through her who receive actual notice of th[e] Order . . . from tortiously interfering with [] Song and Tian's contracts with CrossBorder and with any other CrossBorder employees' contracts with CrossBorder."

Dkt. No. 16.

105.    On July 30, 2020, the TRO was converted by the Court into a preliminary injunction, which remains in full force and effect. *See* Dkt. No. 56.

106.    On March 15, 2021, the Court converted the preliminary injunction into a permanent injunction against the Former Employees. *See* Dkt. No. 140.

107.    On May 6, 2021, Defendant MGO agreed to extend the preliminary injunction for the duration of this Federal Court action. *See* Dkt. No. 145. MGO has not agreed to a permanent injunction.

## FIRST CAUSE OF ACTION
### *Misappropriation of Trade Secrets and Confidential and Proprietary Information*
### *(against both Defendants)*

108.    CrossBorder repeats and realleges paragraphs 1-107 as if fully set forth herein.

109.    CrossBorder possesses trade secrets and confidential and proprietary information, specifically including CrossBorder's Master List and prospect list.

110.    Those trade secrets and that confidential and proprietary information give CrossBorder a significant advantage over its competitors — an advantage that would be lost if such trade secrets and confidential and proprietary information became known to CrossBorder's competitors.

111.    The trade secrets and confidential and proprietary information derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

112.    CrossBorder has made reasonable efforts under the circumstances to protect the confidentiality of the trade secrets and confidential and proprietary information, including designating certain information as confidential, requiring employees to sign confidentiality agreements, restricting access to such information, safeguarding such information with encryptions, and providing Company-issued computers and mobile phone technology to employees to ensure that CrossBorder confidential information remains on CrossBorder devices and networks.

113.    The Former Employees had knowledge of, and access to, CrossBorder's trade secrets and confidential and proprietary information.

114.    The Former Employees were and remain under a duty to keep CrossBorder's trade secrets and confidential and proprietary information confidential and not to use, exploit or divulge such information, other than for the benefit of CrossBorder and with its authorization.

115.    The Former Employees misappropriated CrossBorder's trade secrets and confidential and proprietary information for MGO's gain, without regard to CrossBorder's rights, and without compensation, permission, or license from CrossBorder.

116.    Defendants MGO and Agarwal had knowledge of, and indeed encouraged and facilitated, the Former Employees' misappropriation of CrossBorder trade secrets and confidential and proprietary information, thereafter utilizing such misappropriated information to actively solicit CrossBorder's clients.

117.    Defendants Agarwal and MGO's conduct was and remains willful and wanton, in bad faith and with blatant disregard for CrossBorder's valid and enforceable rights, entitling CrossBorder to the recovery of punitive damages.

118.    As a result of Defendants Agarwal and MGO's conduct, CrossBorder has been, and is still being, damaged in an amount in excess of $75,000 to be determined at trial.

119.    CrossBorder has suffered irreparable harm as a result of Defendants' conduct and will continue to suffer irreparable harm that cannot be adequately redressed at law, unless they are permanently enjoined from engaging in any such further conduct.

## SECOND CAUSE OF ACTION
### *Violation of The Defend Trade Secrets Act, 18 U.S.C. 1836 et seq.*
### *(against both Defendants)*

120.    CrossBorder repeats and realleges paragraphs 1-119 as if fully set forth herein.

121.    CrossBorder possesses trade secrets including CrossBorder's Master List and prospect list.

122.     The trade secrets give CrossBorder a significant advantage over its competitors —
an advantage that would be lost if such trade secrets became known to CrossBorder's competitors.

123.     The trade secrets derive independent economic value, actual or potential, from not
being generally known to the public or to other persons who can obtain economic value from their
disclosure or use.

124.     CrossBorder has made reasonable efforts under the circumstances to protect the
confidentiality of its trade secrets, including designating certain information as confidential,
requiring employees to sign confidentiality agreements, restricting access to such information,
safeguarding such information with encryptions, and providing Company-issued computers and
mobile phone technology to employees to ensure that CrossBorder confidential information
remains on CrossBorder devices and networks.

125.     The Former Employees misappropriated CrossBorder's trade secrets for
Defendants MGO and Agarwal's gain, without regard to CrossBorder's rights, and without
compensation, permission, or license from CrossBorder.

126.     Defendants Agarwal and MGO had knowledge of, and indeed encouraged and
facilitated, the Former Employees' misappropriation of CrossBorder trade secrets and confidential
and proprietary information, thereafter utilizing such information to solicit CrossBorder's clients.

127.     Defendants Agarwal and MGO's conduct was and remains willful and wanton,
malicious, in bad faith and with blatant disregard for CrossBorder's valid and enforceable rights,
entitling CrossBorder to the recovery of its attorneys' fees and punitive damages.

128.     As a result of Defendants Agarwal and MGO's conduct, CrossBorder has been, and
is still being, damaged in an amount in excess of $75,000 to be determined at trial.

129.    CrossBorder has suffered irreparable harm as a result of Defendants' conduct and will continue to suffer irreparable harm that cannot be adequately redressed at law, unless they are permanently enjoined from engaging in any such further conduct.

**THIRD CAUSE OF ACTION**
***Tortious Interference with Contract and Business Relationships***
***(against both Defendants)***

130.    CrossBorder repeats and realleges paragraphs 1-129 as if fully set forth herein.

131.    CrossBorder has valid and enforceable contracts, the Employment Agreements, with the Former Employees.

132.    Hoy had full knowledge of the existence of the Employment Agreements between CrossBorder and Song and Tian.

133.    Defendants Agarwal and MGO had full knowledge of the existence of the Employment Agreements between CrossBorder and the Former Employees.

134.    Defendants also had full knowledge of the Former Employees' misappropriation of CrossBorder trade secrets and confidential and proprietary information, of the Former Employees' breaches of their confidentiality contractual obligations to CrossBorder, and of Song and Tian's breaches of their non-competition and non-solicitation contractual obligations to CrossBorder.

135.    Despite knowledge of those contracts, (1) Hoy, as an MGO employee, tortiously interfered with those contracts by soliciting Song and Tian, among other CrossBorder employees, to join MGO, (2) Hoy, as an MGO employee, tortiously interfered with those contracts by soliciting Song and Tian to misappropriate CrossBorder trade secrets and confidential and proprietary information; and (3) Hoy and Defendants Agarwal and MGO tortiously interfered with those contracts by encouraging and facilitating the misappropriation of CrossBorder trade secrets

and confidential and proprietary information and by using CrossBorder trade secrets and confidential and proprietary information to compete with CrossBorder.

136.    As an agent of Defendant MGO, Hoy's knowledge and acts undertaken while an MGO employee, for the benefit of Defendant MGO, are also imputed to Defendant MGO.

137.    As an agent of Defendant MGO, Defendant Agarwal's knowledge and acts undertaken while an MGO employee, for the benefit of Defendant MGO, are also imputed to Defendant MGO.

138.    Hoy's acts were intentional and conducted with the purpose of interfering with CrossBorder's agreements with Song and Tian and other CrossBorder employees.

139.    Defendants Agarwal and MGO's acts were intentional and conducted with the purpose of interfering with CrossBorder's agreements with the Former Employees and other CrossBorder employees.

140.    CrossBorder had business relationships with the companies on its Master List.

141.    Both Defendants, knowing of those relationships, intentionally interfered with those relationships by attempting to induce clients to terminate their relationships with CrossBorder in favor of relationships with MGO.

142.    Upon information and belief, Defendants repeatedly contacted CrossBorder clients to solicit their business and to induce them to terminate their relationships with CrossBorder.

143.    As a direct result of Defendants Agarwal and MGO's tortious interference, CrossBorder has been, and is still being, damaged in an amount in excess of $75,000 to be determined at trial.

144.    Defendants Agarwal and MGO have acted in an egregious, malicious, willful and wanton manner, and in bad faith when committing the acts alleged above.  As a result, CrossBorder is also entitled to punitive damages against Defendants Agarwal and MGO.

145.    CrossBorder has suffered irreparable harm as a result of Defendants' conduct and will continue to suffer irreparable harm that cannot be adequately redressed at law, unless Defendants are permanently enjoined from engaging in any such further conduct.

## FOURTH CAUSE OF ACTION
### *Injunctive Relief*
### *(against both Defendants)*

146.    CrossBorder repeats and realleges paragraphs 1-145 as if fully set forth herein.

147.    As alleged above, Hoy intentionally and wrongfully downloaded CrossBorder trade secrets and confidential and proprietary information, to a thumb drive, while employed by CrossBorder, and solicited Song and Tian to leave CrossBorder and join her at MGO.

148.    Hoy also intentionally and wrongfully solicited Song and Tian to misappropriate trade secrets and confidential and proprietary information belonging to CrossBorder for MGO's benefit.

149.    Defendants Agarwal and MGO had knowledge of, encouraged and facilitated Hoy's solicitation of Song and Tian to leave CrossBorder and Song and Tian's misappropriation of trade secrets and confidential and proprietary information belonging to CrossBorder, for MGO's benefit.

150.    Defendants have repeatedly solicited CrossBorder clients and used Confidential Information to attempt to poach CrossBorder's customers and to directly compete with CrossBorder.

151.    Defendants also wrongfully took and maintained possession of CrossBorder trade secrets and confidential and proprietary information.

152.    Defendants Agarwal and MGO had knowledge of, encouraged and facilitated the Former Employees' misappropriation of CrossBorder trade secrets and confidential and proprietary information and then used such information to solicit CrossBorder clients.

153.    CrossBorder therefore seeks permanent injunctive relief against Defendants: (1) enjoining Defendants, and all persons acting in concert with or through them who receive actual notice of the injunction, from disclosing or using CrossBorder Confidential Information; (2) enjoining Defendants and all persons acting in concert with or through them who receive actual notice of the injunction, from tortiously interfering with CrossBorder employees' contracts with CrossBorder.

154.    CrossBorder has no adequate remedy at law as to this claim.  CrossBorder cannot be compensated adequately for injuries by an award for damages if Defendants improperly use, maintain, or transmit CrossBorder Confidential Information to or for the benefit of anyone other than CrossBorder.

155.    Defendants' intentional and wrongful conduct, as described above, unless and until permanently enjoined and restrained by order of this Court, could disrupt the status quo and cause great and irreparable injury to CrossBorder.

156.    Accordingly, CrossBorder seeks permanent injunctive relief as set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, CrossBorder respectfully requests that the Court enter judgment in favor of CrossBorder and against Defendants, awarding CrossBorder:

(a) Permanent injunctive relief:

(1) enjoining Defendants, and all persons acting in concert with or through them who receive actual notice of the injunction, from disclosing or using CrossBorder Confidential Information; and

(2) enjoining Defendants and all persons acting in concert with or through them who receive actual notice of the injunction, from tortiously interfering with any CrossBorder employees' contracts with CrossBorder.

(b) Compensatory damages against Defendants in an amount to be determined at trial;

(c) Punitive damages against Defendants in an amount to be determined at trial;

(d) Attorneys' fees and costs;

(e) Pre- and post- judgment interest; and

(f) Such other and further relief as the Court deems just and proper.

Dated: March 7, 2022                    Respectfully submitted,

                                        **PILLSBURY WINTHROP SHAW PITTMAN LLP**

                    By:     */s/ Kenneth W. Taber*
                            Kenneth W. Taber
                            Brian L. Beckerman
                            31 West 52nd Street
                            New York, NY 10019-6131
                            Tel: (212) 858-1000
                            Fax: (212) 858-1500
                            kenneth.taber@pillsburylaw.com
                            brian.beckerman@pillsburylaw.com

                            *Attorneys for Plaintiffs CrossBorder Solutions, Inc. and Cross Border Transactions, LLC d/b/a CrossBorder Solutions*

28