UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/19/2024
```

CROSSBORDER SOLUTIONS, INC. and
CROSSBORDER TRANSACTIONS, LLC d/b/a
CROSSBORDER SOLUTIONS,

                                    Plaintiffs,

-against-

MACIAS, GINI & O'CONNELL, LLP and
SANJAY AGARWAL,

                                    Defendants.

20-cv-4877 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

Plaintiffs CrossBorder Solutions, Inc. and CrossBorder Transactions, LLC d/b/a CrossBorder Solutions[1] ("Plaintiffs" or "CrossBorder") bring this action against Macias, Gini & O'Connell LLP ("MGO") and Sanjay Agarwal (together, "Defendants") alleging claims for (1) misappropriation of trade secrets and confidential and proprietary information; (2) violation of the Defend Trade Secrets Act ("DTSA"); (3) tortious interference with contract and business relationships; and (4) injunctive relief. (Second Amended Complaint "SAC," ECF No. 158.)

Presently before the Court are Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Summary Judgment. (ECF Nos. 313, 314.) For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART and Plaintiffs' motion is DENIED.

## **BACKGROUND**

### I.    FACTUAL BACKGROUND

The facts below are drawn from the Amended Complaint, Defendants' Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 ("Defs. 56.1," ECF No. 225);

---

[1] During the pendency of this litigation CrossBorder Solutions, Inc became Exactera, Inc., and Cross Border Transactions LLC became Exactera LLC. The Court continues to refer to Plaintiffs as CrossBorder for clarity and consistency.

Plaintiffs' Response to Defendants' Rule 56.1 Statement ("Pls. 56.1(c)," ECF No. 238); Plaintiffs'

Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 ("Pls. 56.1," ECF No.

220); Defendants' Response to Plaintiffs' Rule 56.1 Statement ("Defs. 56.1(c)," ECF No. 258);

and the Parties' declarations[2] and corresponding exhibits.[3] All rational inferences are drawn in the

non-moving party's favor.

### A. CrossBorder's Transfer Pricing Services

CrossBorder offers clients transfer pricing services, which refers to the rules and methods

for pricing transactions within and between businesses under common ownership and control, such

as between corporate subsidiaries and their parents. (Pls. 56.1 ¶ 1.) CrossBorder offers these

services to clients in the United States and internationally. (*Id.*) Plaintiffs characterize finding

clients in need of its "sophisticated, niche" transfer pricing services as akin to finding a "needle in

the haystack." (*Id.* ¶ 3.) Defendants dispute this fact, pointing to the significant amount of internal

---

[2] Plaintiffs' cited declarations include: Declaration of Lijun "Maggie" Tian ("Tian Decl.," ECF No. 221); 01/19/2024 Declaration of Stephanie Israel ("01/19/2024 Israel Decl." ECF Nos. 255 and 315); 09/30/2022 Declaration of Kenneth W. Taber ("09/30/2022 Taber Decl.," ECF No. 230); and 12/05/2022 Declaration of Kenneth W. Taber ("12/05/2022 Taber Decl.," ECF No. 256).

Defendants' cited declarations include: 01/19/2024 Declaration of Philip Strach ("01/19/2024 Strach Decl.," ECF No. 325) and 02/02/2024 Declaration of Philip Strach ("02/02/2024 Strach Decl.," ECF No. 332).

[3] Citations to the deposition of Sanjay Agarwal refer to exhibits attached to the 11/14/2022 Declaration of Philip Strach ("11/14/2022 Strach Decl.," ECF Nos. 231 and 244), 09/30/2022 Taber Declaration, and 12/05/2022 Taber Declaration ("Agarwal Tr.," ECF Nos. 231-1, 230-32, 244-1, 256-1). Citations to the deposition of Liga Hoy refer to exhibits attached to 09/30/2022 Taber Declaration and 11/14/2022 Strach Declaration ("Hoy Tr.," ECF Nos. 230-31, 231-2, 244-2). Citations to depositions of Stephanie Israel refer to exhibits attached to the 02/02/204 Strach Declaration and 11/14/2022 Strach Declaration ("Israel Tr.," ECF Nos. 322-1, 244-4, and 231-4). Citations to the deposition of Sevine H. Aydemir refer to exhibits attached to the 11/14/2022 Strach Declaration ("Aydemir Tr.," ECF Nos. 231-6, 244-6). Citations to the deposition of Juline Cohen refer to exhibits attached to the 11/14/2022 Strach Declaration ("Cohen Tr.," ECF Nos. 231-5, 244-5). Citations to the deposition of Jiaxin "Claire" Song refer to exhibits attached to the 11/14/2022 Strach Declaration ("Song Tr.," ECF Nos. 231-3, 244-3).

referrals used for transfer pricing services and CrossBorder's reliance on client lead lists. (Defs. 56.1(c) ¶¶ 3, 5; Defs. 56.1 ¶ 92.)

The parties do not dispute, however, that CrossBorder employed 75 full time people in its sales and marketing operations at a cost of ███████ per month to build its client base. (Pls. 56.1 ¶ 4.) CrossBorder's Sales Development Representatives typically would make around 150 calls a day to secure two appointments with client prospects. (*Id.*) By mid-2020, after expending thousands of hours and over ████████ in development costs, CrossBorder built a client base of approximately 500 clients. (*Id.* ¶ 5.)

### B. The Master List

To track and manage its relationships with each client, CrossBorder manually maintained an excel spreadsheet (the "Master List") detailing extensive information about each client. (*Id.* ¶ 6.) The Master List contained the following information for each client: the term and date of CrossBorder's contract with the client; the estimated expiration date of the contract; primary and secondary contacts at the client; phone numbers and email addresses for each such contact; the lead CrossBorder employee assigned; notes about the client's satisfaction with CrossBorder; the potential for upsell opportunities with the client; the first install date of CrossBorder's work product; the dollar value of CrossBorder's relationship with the client; and information from which the pricing of CrossBorder's contract could be derived. (09/30/2022 Israel Ex. D.) Not all columns of the Master List were routinely filled out. (*See id.*)

To protect the Master List, CrossBorder (1) stored the Master List on an internal share drive called SharePoint that could only be accessed using a company username and password and (2) encrypted the document so only those employees with express permission could access it. (*Id.* ¶ 8.) ████████████████████████████████████████████████████████████



(Aydemir Tr. 70:22-72:15;

Israel Tr. 30:2-8.) ████████████████████████████████████████

████████████████████████ (*Id.*)

Despite these protections, as Defendants observe, the Master List was not marked or otherwise identified as confidential, and employees who had access could freely email, download, and print it. (Defs. 56.1 ¶ 94; Pls. 56.1(c) ¶ 94.) ████████████████████

████████ (Israel Tr. 73:15-19). ████████████████████████

████████████████████ (Israel Tr. 69:24-70:3.) ████████████

████████████████████████████████████████

████████████ Aydemir Tr. 53:8-11 ██████████████

██████████████████████████ Israel Decl. ¶ 12 (stating it was "common knowledge" that sharing information in the Master List would be a fireable offense).)

### C. Hoy, Tian, and Song Join CrossBorder

Liga Hoy, Jiaxin "Claire" Song, and Lijun "Maggie" Tian (the "Former Employees") began working for CrossBorder in 2018. (Pls. 56.1 ¶¶ 11-13.) Hoy joined CrossBorder as Senior Economist; Tian as a Transfer Pricing Manager; and Song as a Transfer Pricing Senior Analyst. (*Id.*) As a condition of their employment, the Former Employees all signed employment agreements, which included confidentiality, non-solicitation, and non-compete clauses.

The confidentiality provision provides that the Former Employees agreed "to hold in confidence all Confidential Information and not to use such information for [their] own benefit or to reveal, report, publish, disclose or transfer, directly or indirectly, any Confidential Information to any person or entity, or to utilize any Confidential Information for any purpose, except in the

4

course of [their] work for the Company." (09/30/2022 Israel Exs. A-C.) "Confidential information" expressly includes "customer lists," "lists of prospective customers," "business or technical needs of customers," and "arrangements with customers." (*Id.*)

The non-solicitation provision provides that for two years following the termination of the Former Employees' employment, they will not (1) "directly or indirectly solicit or hire any employee of the Company or its affiliates or induce any employee of the Company or its affiliates to leave the Company" and (2) "directly or indirectly, solicit the business of any customer or potential customer or persuade any customer or potential customer to cease doing business with CrossBorder." (*Id.*) Finally, the non-compete provision provides that for one year after the termination of their employment, the Former Employees "shall not engage in Competitive Activity," defined as "involvement . . . with any person or entity . . . engaged in any business activity which is materially competitive with the Company, wherever located" (*Id.*)

### D. Hoy's Termination from CrossBorder and Joining of MGO

In January 2020, CrossBorder terminated Hoy's employment with the company. (Pls. 56.1 ¶ 16.) In March 2020, Hoy joined MGO as a Leader of National Transfer Pricing and Manager Director of Transfer Pricing and Valuation. (*Id.* ¶ 19.) MGO offers advisory, business management, taxation, and assurance services in several industries to domestic and international clients. (Defs. 56.1 ¶ 80.) MGO is a competitor to CrossBorder in the transfer pricing field. (09/30/2022 Taber Decl. Ex. FF at 6.)

Hoy reported directly to Sanjay Agarwal, MGO's National Tax Practice Leader and Silicon Valley/San Jose Office Managing Partner. (Pls. 56.1 ¶ 22; Defs. 56.1. ¶ 81.) █████████████

████████████████████████████████████████████

████████████████████████████████████  (Hoy Tr. 226:3-21.)  However,  ██████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ (Agarwal Tr. 192:2-15; 192:9-193:22.)

**E.  Hoy's Solicitation of Others to Join MGO**

Within Hoy's first week at the company, Hoy solicited CrossBorder employees to join MGO, including Song, Tian, and two others. (09/30/2022 Israel Ex. D at XBS016325-163331.)

█████████████████████████████████████████████ (Song Tr. 139:6-11 ████████

████████████████████████████████████████████████████████████ 139:16-19

████████████████████████████████████████████████████████████████████

████████████████████████████████████

On March 27, 2020, Tian interviewed with Agarwal after applying online with MGO. (Tian Decl. ¶ 25.) Tian states that during the interview, Agarwal told her to bring her clients to MGO. (*Id.*) When she expressed concerns about her non-compete obligations, Agarwal allegedly told her not to worry but instead "do anything she could to develop business for MGO's transfer pricing group." (*Id.*) During her last few weeks at CrossBorder, Hoy also "repeatedly contacted [Tian] by phone and asked for CrossBorder confidential information, including the identity of CrossBorder clients and their contact phone numbers and emails, and CrossBorder's contract terms with clients." (*Id.* ¶¶ 31-34.) Finally, after she had applied to MGO but before leaving Cross Border, Tian states she and Hoy discussed her access to the Master List, with Hoy advising her "to be careful" when taking it. (*Id.* ¶¶ 23-25.) On March 30, 2020, Tian downloaded the Master List. (*Id.* ¶ 26.) On April 1, 2020, Tian signed her MGO offer letter. (Pls. 56.1 ¶ 37.) Tian started at MGO on April 16, 2020. (Tian Decl. ¶ 34.) ████████████████████████████████████

████████████████████████████████████████ (Hoy Tr. 162:19-24.) ███████████

6

████████████████████████████████████████████████████████

████████████████████ (Agarwal Tr. 145:8-20.)

On May 21, 2020, Hoy emailed Agarwal a business plan for Song predicated on Song bringing CrossBorder clients to MGO. (Pls. 56.1 ¶ 54.) The Song business plan, which had excerpts of the Master List attached, outlined how Song could bring 47 prospective new clients to MGO. (*Id.* (citing 09/30/2022 Taber Ex. L).) ████████████████████████████████

████████████████████████████████████████ (Song Tr. 88:3-14.) On May 25, 2020, Song signed her MGO offer letter. (Pls. 56.1 ¶ 38.) On June 22, 2020, Song started her employment at MGO. (Defs. 56.1 ¶ 84.)

### F. Solicitation of CrossBorder Clients

Tian states that after they formally joined MGO, Hoy repeatedly told Song and Tian "to do anything possible to develop transfer pricing business for MGO, including bringing CrossBorder clients to MGO." (Tian Decl. ¶ 30.) On April 17, 2020, Hoy instructed Tian to send Hoy the Master List "so [Hoy] could use it during a business development meeting with MGO management the next day." (*Id.* ¶ 36.) Tian emailed the Master List to Hoy the same day. (09/30/2022 Taber Decl. Ex. K.) ████████████████████████████████████████ (Hoy Tr. 99:1-102:25.)

In June 2020, Hoy sent multiple emails with versions of the Master List attached to Agarwal and Juline Cohen, an MGO employee supervised by Agarwal. (*Id.* Exs. P, Q, S.) ████████

████████████████████████████████████████████████████████

████████ (Agarwal Tr. 66:19-22.) ████████████████████████████████████

(Cohen Tr. 145:22-146:22.) Hoy used the Master List to assign CrossBorder's clients to herself, Song, and Tian depending on their past relationship with each client. (09/30/2022 Taber Decl. Ex. P, Q, S.)

Starting on April 14, 2020 and continuing through June 23, 2020, MGO emailed over 200 CrossBorder clients to solicit them to transition to MGO. (*Id.* Ex. J.) Each client contacted was listed on the Master List. (Pls. 56.1 ¶ 50.) Agarwal was copied on over 150 of the more than 200 emails MGO sent to CrossBorder clients. (09/30/2022 Taber Decl. Ex. J.) Agarwal also received updated information about such clients from Hoy and Tian to help with the solicitation efforts. (*Id.* Exs. R, T; *id.* Ex. A at XBS002293.)



(Agarwal Tr. 140:13-141:2

142:24-144:1

148:13-19

On September 22, 2020, Hoy and Song were terminated by MGO for "unethical behavior." (Pls. 56.1 ¶ 71.) On July 31, 2020, Tian was dismissed from MGO for failure to comply with instructions regarding the Court's temporary restraining order. (Defs. 56.1 ¶ 85.)

### G. The Court's Issuance of a Temporary Restraining Order and JAMS Arbitration

On June 18, 2020, a CrossBorder client informed it that Hoy, on behalf of MGO, was repeatedly contacting them to solicit their transfer pricing business. (Israel Decl. ¶ 19.) The next day, CrossBorder's counsel sent cease-and-desist letters to the Former Employees. (Pls. 56.1 ¶ 61.) CrossBorder's counsel never received responses to the cease-and-desist letters. (*Id.* ¶ 63.) On June 25, 2020, CrossBorder filed suit against the Former Employees in this Court. (*Id.* ¶ 65.) On June 26, 2020, the Court entered a temporary restraining order ("TRO") enjoining (1) the Former Employees, and anyone acting in concert with them, from "disclosing or using CrossBorder Confidential Information; (2) the Former Employees from "breaching their confidentiality obligations contained in their respective Employment Agreements with CrossBorder"; (3) Song

and Tian from "breaching their non-solicitation and non-competition contractual obligations contained in their respective Employment Agreements with CrossBorder"; and (4) Hoy, and anyone acting in concert with her, from "tortiously interfering with" Song and Tian's contracts with CrossBorder. (ECF No. 16.)

CrossBorder ultimately resolved its claims against Song and Hoy through arbitration. (Defs. 56.1 ¶ 86.) CrossBorder and Tian reached a settlement agreement, pursuant to which (1) Tian agreed to be interviewed by CrossBorder's counsel and provide a declaration of facts and (2) CrossBorder voluntarily dismissed Tian from the instant action and the JAMS Arbitration.[4] (ECF Nos. 67, 69, 71; 09/30/2022 Taber Decl. Ex. EE at 5-6 (describing Tian as an "informant and witness" for CrossBorder).)

### H. CrossBorder's Alleged Damages

CrossBorder alleges it suffered damages from clients declining to renew their contracts after MGO's solicitation. CrossBorder estimates its historic client renewal rate as ▮▮▮ with a three-year client retention period. (01/19/2024 Israel Decl. ¶ 3-5.) To reach that ▮▮▮ renewal rate, CrossBorder divides the number of renewed contracts by the number of renewable contracts. Before completing the calculation, CrossBorder would remove certain contracts due to outside market factors, including "one-off" projects, clients who had a recent change in leadership, and certain projects considered "non-renewable." (Defs. 56.1 ¶ 121.)

Following the solicitation of more than 200 CrossBorder clients using the Master List, CrossBorder's renewal rate dropped to ▮▮ (*Id.* ¶ 7.) Specifically, CrossBorder claims only ▮ of the approximately 120 clients up for renewal renewed their contracts, resulting in an excess of ▮▮ ▮ client non-renewals. (*Id.*) However, CrossBorder seeks damages for only ▮ of these client non-

---

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Hoy Tr. 105:8-17.)

renewals. (*Id.* ¶ 8.) These ██ non-renewals reflect those who (1) were active clients at the time of Defendants' solicitation; (2) decided not to renew within a year of Defendants' solicitation; and (3) have not since returned as CrossBorder clients. (*Id.* ¶¶ 8-9.) The list also excludes clients (1) that were written off as bad debts for failure to pay CrossBorder for services rendered; and (2) whose decision not to renew was reasonably attributable to other causes. (*Id.*) Plaintiffs identify the following clients as the ██ non-renewals: ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████ (01/19/2024 Israel Decl. ¶ 8.)

CrossBorder contends that Agarwal and MGO's tortious interference caused the sudden drop in renewals. (*Id.* ¶ 7.) For those ██ non-renewal clients, CrossBorder seeks damages only for *excess* non-renewals in accordance with its historic ████ renewal rate. (*Id.* ¶ 10.) CrossBorder estimates its cumulative loss totals ████████ to ████████. (*Id.*) Defendants, however, challenge CrossBorder's alleged losses. ████████████████████████ (Defs. 56.1 ¶ 113 (citing Israel Tr. 22:10-23:3; 26:20-27:10.) Furthermore, ████████████ ████████████████████████ (*Id.* at 28:2-20.)

## II.    PROCEDURAL BACKGROUND

On March 7, 2022, Plaintiffs filed their Second Amended Complaint, the operative complaint.[5] (ECF No. 158.) Plaintiffs assert claims for (1) Misappropriation of Trade Secrets and Confidential and Proprietary Information; (2) Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.;* (3) Tortious Interference with Contract and Business Relationships; and (4)

---

[5] Plaintiffs' Second Amended Complaint names only MGO and Agarwal as defendants in the action. (ECF No. 158.)

Injunctive Relief. (*Id.*) On March 23, 2022, Defendants filed their Answer. (ECF No. 164.) In August 2022, Plaintiffs and Defendants sought leave to file their respective motions for summary judgment, which the Court granted. (ECF Nos. 189, 193, 197.)

On December 26, 2022, Plaintiffs filed their partial motion for summary judgment which requested that the Court (1) grant summary judgment as to liability on all of Plaintiffs' claims; (2) convert the preliminary injunction into a permanent injunction; and (3) schedule a hearing on the issue of damages. (ECF No. 218.) That same day, Defendants filed their respective motion for summary judgment on all of Plaintiffs' claims. (ECF No. 223.) On July 10, 2023, Defendants moved to preclude a portion of the Declaration of Stephanie Israel submitted in support of Plaintiffs' motion for partial summary judgment. (ECF No. 286.) In the alternative, Defendants requested the Court reopen damages discovery. (*Id.*) Plaintiffs voluntarily agreed to reopen damages discovery. (ECF No. 288.) On August 10, 2023, the Court reopened damages discovery and referred the case to a magistrate judge to handle all matters related to such discovery. (ECF No. 297.)

The parties conducted damages discovery from August 2023 until late December 2023. (*See* ECF No. 311.) On January 4, 2024, after the parties informed the Court of the completion of damages discovery, the Court granted the parties' request to amend their respective summary judgment filings to address the issue of damages. (ECF Nos. 312.) On February 12, 2024, Defendants filed their amended papers and Plaintiffs filed amendments to their papers initially filed on December 26, 2023.[6] (ECF Nos. 313, 314.) In their amended papers, Plaintiffs seek

---

[6] Defendants' operative moving papers are as follows: Defendants' Amended Memorandum of Law in Support ("Defs. Mem.," ECF No. 323); Defendants' Amended Reply Memorandum of Law in Further Support ("Defs. Reply," ECF No. 336); and Defendants' Amended Opposition to Plaintiffs' Motion ("Defs. Opp., ECF No. 331).

judgment for liability on all issues and Defendants seek summary judgment on Plaintiffs' tortious interference of contract claim for failure to establish damages.

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Whether particular facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense . . . ." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation but must come forward with specific evidence

---

Plaintiffs' operative moving papers are as follows: Plaintiffs' Memorandum of Law in Support ("Pls. Mem.," ECF No. 219); Plaintiffs' Reply in Further Support ("Pls. Reply," ECF No. 254); Plaintiffs' Opposition to Defendants' Motion ("Pls. Opp.," ECF No. 257); Plaintiffs' Amendments to Their Motion (ECF No. 314); Plaintiffs' Amended Opposition ("Pls. Amend. Opp.," ECF No. 338); and Plaintiffs' Amended Reply in Further Support ("Pls. Reply," ECF No. 343).

Pursuant to the Parties' Stipulated Confidentiality Agreement and Protective Order, the parties filed certain documents under seal. The parties filed a joint letter identifying each document filed under seal and the corresponding document filed publicly on the record, along with each document's docket number. (ECF No. 362.)

demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

<u>**DISCUSSION**</u>

In their SAC, Plaintiffs assert claims for (1) Misappropriation of Trade Secrets and Confidential and Proprietary Information; (2) Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.;* (3) Tortious Interference with Contract and Business Relationships; and (4) Injunctive Relief. (*Id.*) Both Plaintiffs and Defendants seek summary judgment on all claims. The Court addresses each claim in turn.

## I.    TRADE SECRETS

Plaintiffs' first and second causes of action allege Defendants misappropriated trade secrets by disseminating and unlawfully using the Master List. The DTSA provides a private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To prevail on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove that "(1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023) (citations omitted).

The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or code," provided that (1) "the owner has taken reasonable measures to keep such information secret; and (2) the information derives independent economic value, actual or potential, for not being generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. §1839(3).

A plaintiff asserting a misappropriation of trade secrets claim under New York law must show "(1) it possessed a trade secret, and (2) [the] defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 421 (S.D.N.Y. 2021) (citing *Integrated Cash Mgmt. Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)). To determine whether information constitutes a trade secret, New York courts consider:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Better Holdco, Inc.*, 666 F. Supp.3d at 395 (citing *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990), in turn quoting *Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 453 N.Y.S.2d 470, 472 (1982)). "[T]he elements for a misappropriation claim under New York law are fundamentally the same as a DTSA claim." *Id.* at 421. Accordingly, courts have held that findings on summary judgment on a DTSA claim apply

equally to a New York misappropriation claim. *See Better Holdco, Inc.*, 666 F. Supp. at 395; *see also Zabit*, 540 F. Supp. 3d at 420 (noting that "courts have found that a complaint sufficiently pleading a DTSA claim also states a claim for misappropriation of trade secrets under New York law.") (cleaned up).

Defendants and Plaintiffs seek summary judgment on (1) whether the Master List is a trade secret under state and federal law and (2) if so, whether Defendants misappropriated the Master List. The Court addresses each issue in turn.

**A.  Existence of a Trade Secret**

The existence of a trade secret is usually a question of fact for the jury. However, a court may resolve the issue on summary judgment "where it is clear the information at issue is not usually secret or there is no discernible economic value from that information not generally being known." *Better Holdco, Inc.*, 666 F. Supp. at 384.

"A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (citations omitted); *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 215 (S.D.N.Y. 2013), *on reconsideration*, No. 11 CIV. 1675 (JPO), 2014 WL 13109132 (S.D.N.Y. Apr. 14, 2014) (citing *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 606 (S.D.N.Y. 2001)) ("Where a company's customers are not readily ascertainable, but must be cultivated with great effort and secured through the expenditure of considerable time and money, the names of those customers are [protectable] trade secrets.").

1.  <u>Whether Plaintiffs Took Reasonable Measures to Keep the Master List Secret</u>

"The most important consideration in determining whether information is a trade secret is whether the information was secret." *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 421 (S.D.N.Y. 2021) (quoting *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 514 (S.D.N.Y. 2017)). "Although absolute secrecy is not required, a trade secret must be veiled in sufficient secrecy that except by use of improper means, there would be difficulty in acquiring the information." *Toan & Country*, 556 F. Supp. 3d at 385. Thus, both the DTSA and New York law require a plaintiff to take reasonable measures to keep its trade secrets confidential. Both Plaintiffs and Defendants seek summary judgment on whether Plaintiffs took reasonable measures to maintain the secrecy of the Master List. The Court finds Plaintiffs met their burden while Defendants have not.

Courts have found that two-factor authentication and limiting access to certain, pertinent employees are sufficiently reasonable protective measures to withstand a motion for summary judgment. *See Better Holdco, Inc.*, 666 F. Supp. at 386 (finding two-factor authentication, limited access to employees who are actively working on the allegedly proprietary information, termination of employee access upon employee's departure, and periodic reviews to ensure only authorized users accessed the information reasonable measures) (collecting cases). Plaintiffs put forth evidence that they implemented the same measures—the Master List was (1) stored on an internal drive that employees could only access using their Company username and password[7] and (2) encrypted with a permission restriction, so only those with express permission could access the list, which CrossBorder limited to "client-facing employees. (Israel Decl. ¶¶ 9-10.) █████████

---

[7] Defendants emphasize that the Master List was not "password protected, encrypted, or marked confidential." (Defs. 56.1 ¶ 94.) This is true as to the excel file itself. However, CrossBorder did password-protect the Master List by requiring CrossBorder employees to use their password credentials and/or acquire permission before they could access the secured share drive where the Master List was stored. (Pls. 56.1(c) ¶ 94.)



(*See* Aydemir Tr. 71:2-72:15; Israel Tr. 30:2-8.)

(Aydemir Tr. 70:22-71:1.)

(Aydemir Tr. 72:13-74:1; *see also* Defs. 56.1(c) ¶ 93.)

The Court denies therefore Defendants' motion for summary judgment on this issue.

Defendants challenge the "reasonable measures" used to protect the Master List by arguing that CrossBorder (1) did not have written policy regarding access to the Master List; (2) employees did not receive training on the confidentiality of client information; (3) the Master List was not marked confidential; and (4) client information was not treated as confidential and shared via employees' personal emails. (Defs. Mem. at 6-7.) These arguments are insufficient to raise a dispute of material fact as to whether CrossBorder used reasonable measures to maintain the confidentiality of the Master List—the evidence in the record establishes CrossBorder did so.

First, the Court is unpersuaded that a written policy is required so long as a policy and practice of protecting confidential client information was followed by employees.

(Israel Tr. 69:24-70:3

; Aydemir Tr. 53:8-11

 Israel Decl. ¶ 12

("[I]t was common knowledge that sharing the Master List was a fireable offense").)

In particular, Defendants repeatedly emphasize the ways employees *could* mishandle the Master List given that the file could be printed, downloaded, and emailed to external email addresses. (*See* Defs. Mem. 56.1 ¶ 94.) However, this does not reflect the *actual* treatment of the Master List and certainly does not detract from the protective measures actually in place.

Significantly, CrossBorder had employees sign confidentiality agreements wherein they agreed to protect confidential client information. The confidentiality agreements signed by Hoy, Tian, and Song stated they could not use confidential information for their own benefit or reveal, report, publicly disclose, or transfer such information. (Defs. Ex. A at 85-86; Defs. Ex. B at 464-65; Defs. Ex. C at 72-73.) "Confidential information," as defined in the agreement, explicitly included "customer lists," "lists of prospective customers," "business or technical needs of customers," and "arrangements with customers." (*Id.*) Therefore, the confidentiality agreements further support that CrossBorder imposed sufficient protective measures to ensure the

confidentiality of its client information, including the Master List. *See N. Atl. Instruments, Inc.*, 188 F.3d at 45 (signing of confidentiality agreements and password restrictions appropriate to maintain confidentiality of alleged trade secrets).

Defendants further rely on  (Israel Tr. 50:19-23

*id.* at 73:15-19

Song Tr. 68:11-14

While

(Israel Tr. 50:19-51:2.) Regardless, the lack of training does not substantively undercut the existing protective measures CrossBorder used.

Defendants further repeatedly assert CrossBorder employees had a practice of sending client information to personal rather than company email accounts. (*See* Pls. 56.1 ¶ 97.) However, Defendants proffer no evidence that the Master List was sent to employees' personal email accounts. (*See* Pls. 56.1 ¶ 97; Defs. 56.1(c) ¶ 97; *see* Song Dep. 36:25-37:6

Instead,

(Aydemir 96:15-97:23.) Beyond this fact,

(Aydemir Dep. 67:9-14, 79:22-81:5.)

Upon consideration of the evidence and the parties' arguments, the Court concludes Plaintiffs used reasonable protective measures to maintain the confidentiality of the Master List. The Court therefore considers the next prong of the trade secrets analysis—whether the Master List consisted of information generally known and/or readily ascertainable.

2.   Whether the Information in the Master List is Generally Known and/or Readily Ascertainable

Under both New York law and the DTSA, a trade secret must not be generally known or readily ascertainable. 18 U.S.C. § 1839(3)(B). The DTSA goes a step further to require the trade secret to "derive independent economic value." *Id.* "Where both parties have proffered evidence as to whether an alleged trade secret is well-known in the industry, a genuine issue of fact exists and summary judgment for either party is not warranted." *Town & Country*, 556 F. Supp. 3d at 274 (citing *Editions Play Bac, S.A. v. Western Publ'g Co., Inc.*, 1993 WL 541219, at *6 (S.D.N.Y. Dec. 28, 1993); *ScentSational Tech., LLC v. PepsiCo, Inc.*, 2017 WL 4403308, at *12 (S.D.N.Y. Oct. 2, 2017)). Defendants argue CrossBorder did not expend substantial effort in creating the Master List, and even if they did, the information contained therein is readily ascertainable. (Defs. Mem. at 8-9.) The Court disagrees with both contentions.

First, it is undisputed that CrossBorder hired 75 full time employees for its sales and marketing operations at a cost of ███████ per month to build its client base. (Defs. 56.1(c) ¶ 4.) As part of those operations, representatives in the Sales Department would make 150 phone calls a day to secure a couple appointments with client prospects. (9/30/2022 Israel Decl. ¶ 6.) After expending thousands of hours and ███████ dollars in business development costs, CrossBorder built a client base of approximately 500 clients by mid-2020. (Israel Decl. ¶ 7; *see* 9/30/2022 Israel Decl. Ex. D.) Undoubtedly, CrossBorder extended substantial efforts in building its client base, and therefore the Master List.

20

This "substantial effort" is reflected in the Master List itself. While Defendants are correct that the Master List contains client names, contact information, contract value, and expiration date, the Master List also contains each client's primary and secondary contacts as well as phone numbers and email addresses for each such contact. The identities of individual contacts for clients may constitute trade secrets. *N. Atl. Instruments, Inc.*, 188 F.3d at 44-45 (finding that while the list of individual companies did not constitute trade secrets, the identities of individual contact people did).

Plaintiffs further characterize identifying clients in need of their transfer pricing services as akin to "finding a needle in a haystack"—a representation Defendants dispute. (Pls. 56.1 ¶ 3; Defs. 56.1(c) ¶ 3.) Specifically, ███████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████ As Defendants correctly observe, █████████████████████████

██████████████████████████████████████████ (Israel Tr. 378:3-10.) However, ████████████████████████████████████████████

████████ (*Id.* 37:14-38:2.) ████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████ (Israel Tr. 38:11-16.) Moreover, ████████████████████

█████████████████████████████████ (Agarwal Tr. 22:13-22) ████████████████

█████████████████████████████

While Defendants may be correct that the clients on the Master List could be readily identified using publicly available information, Plaintiffs have shown that identifying those individuals who use the niche tax services that MGO and CrossBorder provide required substantial efforts. CrossBorder describes transfer pricing services as "the rules and methods for pricing

transactions within and between businesses under common ownership or control, such as between corporate subsidiaries and their parents." (Pls. 56.1 ¶ 1.) CrossBorder's services, therefore, are not generalized financial or tax services, but a specialty service for a distinct number of companies. And the record shows CrossBorder extended such substantial time and effort to identify the specific clients who require CrossBorder's specialized tax services. Therefore, the evidence is sufficient to show the Master List is not readily ascertainable. *See Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 427, 278 N.E.2d 636 (1972) ("[W]here customers are not known in the trade or are discoverable only be extraordinary efforts courts have not hesitated to protect customer lists and files as trade secrets."); *Town & Country House & Home Serv., Inc. v. Newbery*, 3 N.Y.2d 554, 170 N.Y.S.2d 328, 333, 147 N.E.2d 724 (1958) (enjoining defendant from soliciting plaintiff's customers because they were "screened . . . at considerable effort and expense, without which their receptivity and willingness to do business with this kind of a service organization could not be known."); *c.f. Sasqua Grp., Inc. v. Courtney*, No. CV 10-528 ADS AKT, 2010 WL 3613855, at *10 (E.D.N.Y. Aug. 2, 2010), report and recommendation adopted, No. 10-CV-528 ADS ETB, 2010 WL 3702468 (E.D.N.Y. Sept. 7, 2010) (customer contact information not a trade secret where developed "in a market that is not so highly specialized but has many, easily identifiable, potential customers.")

The cases cited by Defendants are distinguishable. In both *Kadant* and *Free County*, the Court determined that client lists were not trade secrets when those lists included the contact information for the companies themselves. *See Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 566 (S.D.N.Y. 2016) ("[Plaintiffs'] customers are well-known apparel retailers whose identities are not protected."). Here, in contrast, the Master List includes contact information for individuals within the company. As noted above, courts have held that such information constitutes trade

secrets. *N. Atl. Instruments, Inc.*, 188 F.3d at 44-45 (finding that while the list of individual companies did not constitute trade secrets, the identities of individual contact people did); *see also B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 CIV. 9988 (SCR), 2006 WL 3302841, at *3-5 (S.D.N.Y. Jan. 31, 2006) (finding the names of specific contacts at plaintiffs' clients constitute trade secrets) (citation omitted).

In seeking dismissal of Plaintiffs' claims, Defendants primarily rely on the Master List containing publicly information such as the client's name, industry, contract duration, and contract value. Otherwise, Defendants present no evidence to support their contention that the Master List is sourced from publicly available or easily ascertainable information and could be easily developed or even replicated. Moreover, Hoy herself testified that no one could reconstruct the Master List without obtaining the information from CrossBorder. Based upon its review of the Master List and the applicable law, the Court agrees and finds the evidence shows Plaintiffs satisfy this prong.

### B. Misappropriation

Having determined that Plaintiffs possessed a trade secret, the Court now determines whether Defendants misappropriated said trade secret. The DTSA identifies three types of "misappropriation"—(1) acquisition, (2) disclosure, or (3) use. *See* 18 U.S.C. § 1839(5)). Under the statute, it is unlawful for a person to acquire, disclose, or use a trade secret that the person knows or should have known was acquired by or derived from improper means. "Improper means includes theft, bribery, misrepresentation, and breach or inducement of a breach of a duty to maintain secrecy, but excludes reverse engineering, independent derivation, or any lawful means of acquisition." *Better Holdco, Inc.*, 666 F.Supp.3d at 389 (citing *Town & Country*, 556 F. Supp. 3d at 255, *in turn quoting* 18 U.S.C. 1839(6)).

Here, Plaintiffs argue it is undisputed that Defendants engaged in all three types of misappropriation—through the improper acquisition, disclosure, and use of the Master List. (Pls. Mem. at 19.) Specifically, Plaintiffs allege over 200 distinct acts of misappropriation "committed with Defendants' actual knowledge that the Master List was acquired by improper means." (*Id.* at 19-20.) Defendants counter that Plaintiffs fail to present any evidence that Agarwal or anyone at MGO knew the Master List belonged to CrossBorder or that the Former Employees had a duty to keep the Master List confidential. (Defs. Mem. at 12-13; Defs. Reply at 5.) Upon its review of the record, the Court concludes that neither party has carried its burden, and therefore summary judgment is inappropriate as to this issue.

Defendants do not dispute that Agarwal was copied on emails with the Master List attached (Defs. 56.1(c) ¶ 44)—Agarwal received numerous emails with full copies, excerpts, and modified versions of the Master List attached. (*See* 9/30/2022 Taber Exs. Q, P, S.) However, ███████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████ (Defs. 56.1(c) ¶ 44; Agarwal Tr. 35:3-36:19 ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████ 140:13-141:2 ███████████████████████████████ ████████████████████████████████████████████████████ 142:24-144:1 ████████████████████████████████████████████████████████ 148:13-19 ██████████████████████████████████████████████████████████ Moreover, █████████████████████████████████████████████████████████ ████████████████████████████████████ (Agarwal Tr. 108:3-109:4.) ████████████ ██████████████████████████████████████████████ (*Id.* at 66:19-22.)

24

Similarly, Juline Cohen received multiple emails with versions of the Master List attached. (9/30/2022 Taber Decl. Exs. Q, P, S.) ███████████████████████████████████████ ███████████████████████████████████████████████ (Cohen Tr. 145:22-146:22.) The record also does not support Plaintiffs' assertion that Agarwal "personally participated" in the drafting of the solicitation emails.[8] (Pls. 56.1 ¶ 54.)

Plaintiffs' strongest arguments lie in the business plan developed for Song to join MGO and the solicitation emails sent to CrossBorder clients. In Hoy's email to Agarwal outlining the business plan for hiring Song, Hoy indicates Song would be hired in part to "███████████ ████████████████████████████████"[9] (9/30/2022 Taber Ex. L at MGO006571.) That said, the business plan does not explicitly mention CrossBorder by name. In the solicitation emails, Hoy, Tian, and Cohen state that Hoy and Tian recently joined MGO from CrossBorder and would like to "████████" regarding the services they could offer. (*See* 9/30/2022 Taber Ex. J.) However, none of the emails in the record make clear that Hoy, Song, and Tian would solicit clients directly and exclusively from CrossBorder. The solicitation emails also fail to suggest that the clients are current or former CrossBorder clients. Rather, the emails read as standard solicitation communications outlining MGO's services and a proposal for a business relationship.

Upon consideration of the evidence and the parties' arguments, the record therefore fails to show Agarwal or Cohen *knew* that the Master List was CrossBorder's property or that the clients therein were CrossBorder clients.

---

[8] At most, ████████████████████████████████, (Tian Decl. ¶ 38.) Tian's testimony, of course, constitutes hearsay. Moreover, ████████████████████ ████████████████████ (Cohen Tr. 55:17-57:4.)
[9] That said, ████████████████████████████████████████████████. (Song. Tr. 88:3-14.)

That said, the Court finds there is a material dispute of fact (1) whether Agarwal should have known the Master List was property of CrossBorder and/or comprised of CrossBorder clients and (2) whether he should have known the solicitation emails were in violation of the Former Employees' employment agreements. At the outset, Defendants do not contend that Agarwal was not aware Hoy, Song, and Tian were former employees of CrossBorder. The evidence also indicates Agarwal was aware of Hoy, Song, and Tian's solicitation efforts. (*See* 12/05/2022 Taber Decl. Exs. L, R, T.)

However, the record presents competing testimony on whether Agarwal was aware of the CrossBorder employment agreement, including the non-compete and non-solicitation provisions.



(Hoy Tr. 226:3-15),

(*id.* 226:15-21). On the other hand,

(Agarwal Tr. 192:2-15.)

(*Id.* 193:15-22.) The jury may reasonably resolve this disputed issue in favor of either party.

If the jury determines that Agarwal or MGO knew of the non-compete and non-solicitation agreements, the jury must also resolve whether Agarwal knew or should have known Hoy, Tian, and Song were acting in violation of those agreements. The email Hoy sent to Agarwal regarding the business plan for Song's employment with MGO included the Master List as an attachment and further indicated that the clients listed in the file were Song and Hoy's current and existing clients. (9/30/2022 Taber Ex. L at MGO006572.) Moreover, the business plan clearly indicates—



under the subheading "███████"—that the clients on the Master List "████████████" worked with Song and "███████████" with Hoy "████████████." (*Id.*) Moreover, Agarwal was copied on an email (that had the Master List attached) from Hoy to Cohen that stated she had assigned Tian, Song, and herself clients to reach out to ████████████████████ ███████████ (09/30/2022 Taber Decl. Ex. Q at MGO 007124.)

Likewise, as noted above, some of the solicitation emails sent by Tian and Hoy explicitly mention their former employment at CrossBorder. However, contrary to Plaintiffs' assertion, the emails did not "expressly mention Hoy, Song, and/or Tian's prior relationship with the client while at CrossBorder." (Pls. 56.1 ¶ 51.) At most, the emails note that Hoy, Song, and Tian had been previously employed at CrossBorder. (*See* 09/30/2022 Taber Decl. Ex. J.) In one email Tian writes ████████████████████████████████████ suggesting the recipient was a current client of CrossBorder. (*Id.* at MGO001030.)

Taken together, a jury could reasonably conclude that Agarwal should have known that the recipients of these emails were CrossBorder clients in violation of a non-solicit or non-compete agreement. Because a genuine dispute of fact exists as to the extent that Agarwal and MGO[10] knew or should have known that the Former Employees were soliciting CrossBorder clients in violation of their employment agreements, the Court denies Defendants' and Plaintiffs' motion for summary judgment as to Plaintiffs' trade secrets claim.

---

[10] Plaintiffs also argue that MGO is liable through the acts of Hoy, who worked at MGO at the time of the alleged misappropriation. (Pls. Opp. at 17.) However, as discussed above, there exists a genuine dispute of fact as to whether MGO possessed the requisite knowledge. Accordingly, summary judgment against MGO on this ground is inappropriate. *Free Country Ltd*, 235 F. Supp. 3d at 565 (no likelihood of success on the merits against defendants who were seemingly unaware of the transfer of confidential information prior to the lawsuit).

## II.    TORTIOUS INTERFERENCE

### A.  Tortious Interference with Contract

Plaintiffs assert a claim for tortious interference with the Former Employees' employment contracts, including (1) the Former Employees' contractual obligations of confidentiality; (2) the Former Employee's contractual obligations of client non-solicitation; (3) Song and Tian's contractual obligations of non-competition;[11] and (4) Hoy's contractual obligations of employee non-solicitation. (Pls. Opp. at 17-18.) A claim for tortious interference of contract requires: "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1375 (1996)).

Defendants argue summary judgment is appropriate because (1) Plaintiffs cannot assert a claim for tortious interference of at-will employment contracts; (2) the non-compete and non-solicitation clauses render the employment agreements invalid; (3) Defendants lacked actual knowledge of the employment contracts; and (4) there is no evidence Defendants "intentionally procured" the breaches of the employment contracts. On the other hand, Plaintiffs argue summary judgment is appropriate because they satisfied all elements of the claim under New York law.

### 1.  At-Will Employment Agreements and the Solicitation of Tian and Song

Defendants argue Plaintiffs cannot assert a claim for tortious interference based on Hoy's solicitation of Tian and Song because their employment agreements were terminable at will. (Defs. Mem. at 14.) Because Plaintiffs have failed to adduce evidence of "wrongful means," Defendants

---

[11] In a footnote, Plaintiffs clarify that they seek to enforce the non-compete provision only as against Song and Tian. (Pls. Opp. at 18 n.6.)

argue, Plaintiffs' tortious interference claim on this ground fails. (Defs. Mem. at 14.) In response, Plaintiffs argue that the wrongful means standard only applies to those at-will employees not bound by a covenant not to compete. (Pls. Opp. at 17 n.5.)

To establish a claim for tortious interference with an at-will employment contract under New York law, a plaintiff must show the defendant "acted with malice or employed wrongful means." *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 444 (E.D.N.Y. 2011) (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 406 N.E.2d 445, 451 (1980)). "Wrongful means include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Id.* (citations omitted). For an at-will employment contact, "[c]ourts are disinclined to find tortious interference . . . unless a former employer can show that fraudulent or criminal activity was used in soliciting its employee." *Id.* at 444.

Plaintiffs correctly observe that non-compete clauses are valid even when an employment contract is terminable at-will. (Pls. Opp. at 17 n.5.); *Barbagallo*, 820 F.Supp.2d at 444 ("Non-compete clauses . . . are enforceable even when the employment contract is terminable at-will.") However, Defendants are not challenging Plaintiffs' claim for tortious interference of Tian's and Song's non-compete agreements on this ground. Rather, Defendants argue the Court should dismiss Plaintiffs' tortious interference claims based on Hoy's *solicitation* of Song and Tian. Defendants correctly argue that—because the employment agreements are terminable at-will—a tortious interference claim is only viable if Plaintiffs demonstrate "fraudulent or criminal activity was used in soliciting" Song and Tian. *Barbagallo*, 802 F.Supp.2d at 444 (citing *Carvel Corp.*,

785 N.Y.S.2d 359, 818 N.E.2d at 1102; *Lockheed Martin Corp. v. Aatlas Commerce Inc.*, 283 A.D.2d 801, 725 N.Y.S.2d 722 (3d Dep't 2001)).

Here, Plaintiffs present no evidence that MGO, Hoy, or Agarwal used wrongful means in soliciting Tian and Song. Plaintiffs argue the use of the Master List in violation of the DTSA— a legal conclusion yet to be resolved—constitutes wrongful means. However, the use of the Master List is irrelevant to whether the *solicitation* of Song and Tian were fraudulent or criminal in any way. (*See* Pls. Opp. at 18 n.5.) Even accepting as true Plaintiffs' contention that Agarwal and Hoy "devised a scheme to avoid the outward appearance of Hoy violating her non-solicit"[12] (Pls. 56.1 ¶ 28), such a "scheme" would not constitute "wrongful means." In fact, there is no evidence Hoy used any means, much less wrongful means, "to effect the termination of employment" of Song and Tian at CrossBorder. *Hobler v. Hussain*, 111 A.D.3d 1006, 975 N.Y.S.2d 212, 215 (2013) (citations omitted). Accordingly, the Court dismisses Plaintiffs' tortious interference with contract claim based on the solicitation of Song and Tian.

### 2.   Validity of the Employment Contracts

Defendants further argue Plaintiffs' tortious interference of contract claim fails because the restrictive covenants render the employment agreements unenforceable as a matter of law. (Defs. Mem. at 15-16.) A restrictive covenant is enforceable if it "(1) is *no greater* than is required for the protection of the *legitimate interest* of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public." *BDO Seidman*, 93 N.Y.2d at 388-89, 690 N.Y.S.2d 854, 712 N.E.2d 1220. With regards to the first prong, the restrictive covenants undoubtedly sought to protect Plaintiffs' legitimate business interests. As discussed above,

---

[12] Note that Defendants deny this factual assertion. (*See* Defs. 56.1(c) ¶ 28 (citing Agarwal Tr. 195:5-22 ███████████████████████████████████████████████

Plaintiffs' Master List compiling all its confidential client information constitutes a trade secret. (*See supra* at Section I.A.) Even if Plaintiffs are unable to prove misappropriation of the list by Defendants, Plaintiffs still retains a legitimate interest in "preventing former employees from exploiting the goodwill of a client or customer which had been created and maintained at the employer's expense, to the employer's competitive detriment." *Poller*, 974 F.Supp.2d at 216-17 (citing *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 9 A.D.3d 805, 806, 780 N.Y.S.2d 675 (3d Dep't 2004), *in turn quoting BDO Seidman,* 93 N.Y.2d at 392, 690 N.Y.S.2d 854, 712 N.E.2d 1220)).

That said, a restrictive covenant that protects an employer's legitimate interests cannot be "unreasonably burdensome" to an employee. Defendants argue the Former Employees' employment contracts are unenforceable because (1) the non-compete provisions are not limited in geographic scope and (2) the non-solicitation provisions prohibit solicitation of clients that the Former Employees have not personally serviced. (Defs. Mem. at 15-16.) Before addressing these arguments, the Court details the relevant provisions in the Former Employees' employment agreements.

### a. *The Employment Agreements*

Hoy, Song, and Tian agreed to the provisions at issue here as a condition of their employment with CrossBorder. (*See* Israel Decl. Exs. A-C.) The non-compete agreement provides that for one year after their termination with CrossBorder, an employee will not engage in "competitive activity," defined as "involvement . . . with any person or entity . . . engaged in any business activity which is materially competitive with [CrossBorder]." *Id.* at XBS000465-466; *id.* at XBS000073; *id.* at XBS000086.) The non-solicitation clause provides that for two years following their termination with CrossBorder, the Former Employees would not indirectly or

directly (1) solicit or hire any employee of CrossBorder or its affiliates; or (2) solicit the business of any customer or potential customer or persuade any customer or potential customer to stop doing business with CrossBorder. (*Id.*)

The Court determines the enforceability of each provision in turn.

### b. *Non-Compete Provision*

"[N]on-compete clauses . . . even where protecting legitimate interests, must be reasonably limited both temporally and geographically in order to withstand judicial scrutiny, as reasonableness will not be found where restrictive covenants act to unreasonably limit trade and burden an individual's livelihood." *Poller*, 974 F.Supp.2d at 220. Here, the non-compete provision is vague and thus overbroad. The provision is not only international in scope but also precludes the Former Employees from engaging in business activity with an entity "materially competitive" with CrossBorder. However, the employment agreements fail to define that phrase. "Materially competitive" could be construed to include any company in the financial services space. The non-compete, therefore, may effectively prohibit the Former Employees from working for any company anywhere in the world. Accordingly, the Court finds the non-compete provision overbroad as written.[13] *Aqualife Inc. v. Leibzon*, 50 Misc. 3d 1206(A), 28 N.Y.S.3d 647, at *6 (N.Y. Sup. 2016) (restrictive covenants overboard and unenforceable "insofar as they both seek to

---

[13] While Plaintiffs cite to cases where courts have enforced non-compete contracts that are international in scope, in most of those cases the non-compete provisions included other protections to ensure they did not impose undue hardships on the employees. *See Int'l Bus. Machines Corp. v. De Freitas Lima*, No. 7:20-CV-04573 (PMH), 2020 WL 5261336, at *9 (S.D.N.Y. Sept. 3, 2020), *aff'd sub nom. Int'l Bus. Machines Corp. v. Lima*, 833 F. App'x 911 (2d Cir. 2021) (restricting employment only where the entity was in a proscribed type of competition with the company, within a geographic area in which employee had job responsibilities in the last twelve months of his employment, begins within twelve months of his termination, and could result in the disclosure or reliance upon confidential information); *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 181 (S.D.N.Y. 2006) (non-compete provision with international scope not overbroad where company contracted to pay employee's salary for twelve months after termination); *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465 (S.D.N.Y. 2001) (covenant restricting competing in the United States reasonable where there existed "a small number of potential customers and qualified brokers).

prevent the individual defendants from soliciting or performing work for any customer of plaintiff and contain no geographic limitations").

Unlike the non-solicitation provision below, the Court declines to "blue-pencil" any unreasonable provisions of the non-compete clause. Even if the Court were to impose a geographical limitation, the restriction on engaging with a "materially competitive" company remains vague and undefined. The Court declines to conceive of a reasonable definition of the term. *See Crye Precision LLC v. Bennettsville Printing*, 755 F. App'x 34, 38 (2d Cir. 2018) (summary order) (district court did not err in declining to "blue-pencil" agreement where "every aspect of the provision remains overly broad"). The Court therefore dismisses Plaintiffs' tortious interference of contract claim based on Song's and Tian's violation of their non-compete obligations.

### c. Non-Solicitation Provision

A restrictive covenant may not bar an employee from soliciting or providing services to (1) clients the employee never acquired a relationship with through his or her employment or (2) those clients an employee recruited through her own independent efforts. *Poller*, 974 F.Supp.2d at 217. The non-solicitation provisions apply to *any* customer, precluding the Former Employees from working with clients for which they had previously never worked. Courts have found such non-solicit agreements unenforceable. *Id.* at 221 ("[A] restriction may not include customers who were served outside of the employee's period of employment."); *Markets Grp., Inc. v. Oliveira*, No. 18CIV2089GHWRWL, 2020 WL 820654, at *13 (S.D.N.Y. Feb. 3, 2020*), report and recommendation adopted*, No. 1:18-CV-2089-GHW, 2020 WL 815732 (S.D.N.Y. Feb. 19, 2020) ([T]he Court of Appeals has repeatedly refused to enforce restrictive covenants that precluded the subject employee from soliciting customers with whom that employee had not worked.")

Even more troublingly, the agreement restricts solicitation of any *potential* customer, therefore precluding the Former Employees from engaging with clients they developed through their own efforts. Likewise, such provisions are also unenforceable. *Poller*, 974 F.Supp.2d at 222 (finding a limitation on soliciting clients plaintiff developed on her own *per se* unreasonable); *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 393, 712 N.E.2d 1220 (1999) (finding it "unreasonable" to extend restrictive covenants to those clients acquired as a result of his "own independent recruitment efforts").

That said, given the circumstances of the case, the Court will "blue pencil the covenant to restrict the [non-solicit] term[s] to a reasonable limitation, and grant partial enforcement for the overly broad restrictive covenant." *Poller*, 974 F.Supp.2d at 221. Here, the Court will "narrow the class of [CrossBorder] clients to which the covenant applies," *id.*, namely solicitation of those clients on the Master List. *See Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 535 (S.D.N.Y. 2016), *amended*, No. 16CIV. 2998, 2016 WL 2731588 (S.D.N.Y. May 3, 2016) (revising non-solicitation agreements to exempt personal and prospective clients).

As a threshold matter, the Court finds there is "an absence of overreaching . . . or other anti-competitive misconduct." *BDO Seidman*, 690 N.Y.S.2d 854, 712 N.E.2d at 1220. First, in the agreement CrossBorder indicates it believed the restrictions contained therein were "reasonable and necessary to protect the Company's legitimate and protectable business interests in preserving its confidentiality." (Israel Decl. Ex. A at XBS000464; Ex. B. at XBS000072; Ex. C at XBS000085.) Moreover, CrossBorder has repeatedly emphasized the importance of protecting the confidentiality of its client information; such concern is reflected in the employment agreements, which includes a confidentiality agreement covering client information. (*Id.*)

34

Furthermore, courts have found covenants limited in duration that restrict an employee from soliciting clients from a confidential customer list enforceable. *See Kelly v. Evolution Markets, Inc.*, 626 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (confidential customer list reasonable and protectable by a reasonable non-solicitation clause despite unlimited geographic scope)). As discussed above, the Court has already determined that the Master List constitutes a trade secret. (*See supra* Section I.A.) Finally, the non-solicitation agreement is otherwise limited in duration and the geographic scope is reasonable given the global nature of CrossBorder's business. Accordingly, the Court finds the restrictive covenants enforceable to the extent that they prohibit solicitation of customers from the Master List.

Finally, Defendants argue the Court should not enforce the non-solicit agreement because "the non-solicits are not tailored to the clients actually worked on by the [Former Employees]." (Defs. Reply at 7.) Specifically, Defendants argue that Plaintiffs have failed to present evidence the Former Employees did not have separate personal or previous professional relationships with these clients. The Court is unpersuaded. First, the Master List itself—comprised of the names of the CrossBorder contact for each client on the list—is sufficient evidence that a relationship with any such client existed or was developed during Hoy, Song, and Tian's employment at CrossBorder.[14] This is further proved by Hoy assigning Song, Tian, or herself to reach out to a client " ███████████████████ " (09/30/2022 Taber Decl. Ex. Q at MGO007124.) Finally, the solicitation emails themselves indicate that the Former Employees relied at least in part on the goodwill of CrossBorder given that certain emails mention their employment with CrossBorder. (*See id.* Ex. J.) The use of an employee's goodwill is precisely the legitimate interest

---

[14] The Court further notes there is no dispute that the Former Employees worked with clients on the Master List. Moreover, there is no evidence in the record suggesting that the Former Employees did not work with any specific client on the Master List. Finally, there is no evidence that the Former Employees also solicited clients they had developed independently during the relevant time period.

restrictive covenants are designed to protect. *See Poller*, 974 F.Supp.2d at 220 (longstanding relationship developed over the course of working for an organization are legitimate property interests entitled to reasonable contractual protection) (citation omitted).

The Court therefore finds the non-solicitation provision—reasonably limited to apply to those clients on the Master List—enforceable as a matter of law.

### 3. Actual Knowledge and Intentional Procurement

Having established the existence of an enforceable contract, the Court next considers the second and third elements of a tortious interference with contract claim. To satisfy the second element, Plaintiffs must show Defendants had "actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached." *Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, No. 14-CV-7529 (RJS), 2016 WL 5414979, at *5 (S.D.N.Y. Mar. 18, 2016) (citations omitted); *Corning Inc. v. Shenzhen Xinhao Photoelectric Tech. Co.*, 546 F. Supp. 3d 204, 211-12 (W.D.N.Y. 2021) ("[T]he defendant need not have been aware of all of the details of the contract, but it must have had actual knowledge of the specific contract.").

To satisfy the third element, intentional procurement without justification, "it is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third-party's contract with the plaintiff." *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) (citing *High Falls Brewing Co., LLC v. Boston Beer Corp.*, 513 Fed.Appx. 12, 13 (2d Cir.2013), in turn citing *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 835 N.Y.S.2d 530, 532, 867 N.E.2d 381 (2007))). "[I]nstead, the evidence must show that the defendant's objective was to procure such a breach." *Id.*

Plaintiffs' remaining tortious interference claims are with respect to Defendants' alleged violation of the confidentiality and non-solicitation agreements by sharing the Master List and

soliciting CrossBorder clients. Plaintiffs claim Defendants are liable for tortious interference with contract (1) based on Agarwal's conduct and (2) because MGO is vicariously liable for Hoy's conduct. The Court addresses Agarwal and Hoy's conduct in turn.

### a. Agarwal

As discussed above, there is a material dispute of fact as to whether Agarwal knew, read, or received the employment agreements. *See supra* at 17-18. That said, even if the jury found Agarwal had knowledge of the employment contracts, dismissal of Plaintiffs' tortious interference of contract claim based on Agarwal's conduct is appropriate. Defendants argue that Agarwal had no knowledge that the Master List contained CrossBorder clients, therefore there is no evidence he induced the solicitation of CrossBorder clients. (Defs. Mem. at 18.) Plaintiffs fail to address this argument in their opposition. In their partial motion for summary judgment, Plaintiffs assert in a conclusory fashion that "Defendants undeniably procured a breach of Hoy, Song, and Tian's confidentiality and client non-solicit agreements" and cite to their Rule 56.1 Statement. The evidence in the cited paragraphs, however, do not support their proposition. The record is devoid of evidence that Agarwal or MGO directed or induced Hoy, Song, or Tian to solicit CrossBorder clients or violate their confidentiality agreements by sharing the Master List. Most critically, as discussed above, Plaintiffs fail to introduce evidence that Agarwal knew—that is had actual knowledge—that the Master List contained CrossBorder clients or that Hoy, Tian, and Song were soliciting current CrossBorder clients to transition them to MGO. Accordingly, Plaintiffs' claim for tortious interference of contract based on Agarwal's conduct must be dismissed.

### b. Hoy

As Defendants correctly observe, Hoy undoubtedly had actual knowledge of the Former Employee's non-solicitation obligations. Therefore, Plaintiffs' remaining theory of liability rests

on Defendants' vicarious liability for Hoy's actions. Defendants argue that ███████████ ████████████████████████████████████████████████████████████ (Defs. Mem. at 18 (citing Hoy Tr. 99:1-102:15).) In response, Plaintiffs argue that who took the Master List is irrelevant given that Hoy, Tian, and Song repeatedly disclosed, copied, and shared the Master List. (Pls. Opp. at 23.) The disclosure of the Master List itself is irrelevant—the relevant inquiry is whether Hoy induced Tian and Song to share the Master List and use it to solicit clients in violation of their employment agreements.

Most evidence that Hoy directed Tian to share the Master List and solicit clients are based on hearsay statements in Tian's declaration. Tian states that Hoy instructed her to send the Master List to Hoy so she could use it during a business development meeting with MGO management. (Tian Decl. ¶ 36; Taber Decl. Ex. K (email from Tian to Hoy containing the Master List).) She also states that Hoy repeatedly contacted Tian prior to her departure from CrossBorder to ask for CrossBorder's confidential information, including confidential client information, and told Tian "to be careful" when taking the Master List. (*Id.* ¶¶ 31-34.) These hearsay statements, without any additional evidence in support, are insufficient to defeat Defendants' motion for summary judgment.[15] *Alvarez v. Michael Anthony George Const. Corp.*, 15 F. Supp. 3d 285, 294 (E.D.N.Y. 2014) (hearsay statement without affirmative evidence in support insufficient to defeat summary judgment).

As for the most compelling evidence, Hoy undisputedly sent Agarwal a business plan detailing how Song could bring CrossBorder clients to MGO with the Master List attached.

---

[15] Defendants also raise issues regarding Tian's credibility. Pursuant to CrossBorder and Tian's settlement agreement, (1) Tian agreed to be interviewed by CrossBorder's counsel and provide a declaration of facts and (2) CrossBorder voluntarily dismissed Tian from the instant action and the JAMS Arbitration.  (ECF Nos. 67, 69, 71; 09/30/2022 Taber Decl. Ex. EE at 5-6 (describing Tian as an "informant and witness" for CrossBorder).)  A jury may reasonably construe Tian's declaration and testimony, which absolved her from liability, as self-serving.

(09/30/2022 Taber Decl. Ex. L.) Moreover, the evidence does show that Hoy emailed Cohen and Agarwal a version of the Master List wherein she "████████ herself, Tian, and Song clients to reach out to based on their "████████████" with the client. (09/30/2022 Taber Decl. Ex. Q at MGO007124.) Tian further states that Hoy told Song and Tian to "do anything possible to develop transfer pricing business for MGO, including bringing CrossBorder clients to MGO" after the Former Employees joined the company. (Tian Decl. ¶ 30.) Defendants largely fail to address this evidence in the record and repeat that MGO and Agarwal lacked actual knowledge of the terms of the contract. (Defs. Opp. at 12-13.) While this is true, it fails to address Plaintiffs' argument that MGO is vicariously liable for Hoy's actions while an employee.

Finally, Defendants argue they cannot be held liable for the breach because they were engaging in justifiable conduct, namely the "pursuit of economic interests." (Defs. Mem. at 19.) Under New York law, "liability for tortious conduct may be cut off if the conduct was justified." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019). "The pursuit of economic interest can suffice, *unless there is a showing of malice or illegality*." *Id.* (citing *Foster v. Churchill*, 87 N.Y.2d 744, 642 N.Y.S.2d 583, 665 N.E.2d 153, 156 (1996)) (emphasis in original). This argument is unpersuasive. The economic interest defense is available where the defendant "acted to protect its own legal or financial stake in the *breaching* party's business." *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 29 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) (citing *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 867 N.E.2d 381, 383 (2007)). "The defense does not, however, apply where the third party is a competitor of the plaintiff." *Id.* MGO concedes it is a competitor of CrossBorder for the transfer pricing services business. (09/30/2022 Taber Decl. Ex. FF at 6.) While Defendants claim they

"simply wanted to build a transfer pricing practice," this is precisely prohibited under applicable law. (Defs. Reply at 8.)

Because the intentional procurement factor is "highly fact-specific, and involves a determination of a defendant's mental state," courts generally do not grant summary judgment on this basis "when there is some evidence from which a jury could infer that the defendant intentionally procured the breach." *Better Holdco, Inc.*, 666 F.Supp.3d at 399 (collecting case). Hoy clearly had some involvement in the solicitation of clients and the use of the Master List. Therefore, the Court finds a genuine dispute of facts exists as to whether Hoy induced or caused Tian and Song to violate their employment agreements.

That said, for the reasons discussed below, the Court dismisses Plaintiffs' tortious interference with contract claim for failure to establish damages.

### 4. Damages

Plaintiff asserting a tortious interference of contract claim must prove damages. *Better Holdco.*, 666 F.Supp.3d at 402. Damages from tortious interference of contract include (1) "the pecuniary loss of the benefits of the contract or the prospective relation;" (2) "consequential losses for which the interference is a legal cause;" and (3) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." *Id.* at 401.

Plaintiffs identify three categories of damages: lost profits, attorneys' fees and costs, and punitive damages. Under New York law, "damages . . . must not be merely speculative, possible, and imaginary, but they must be reasonably certain . . . ." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (citing *Wakeman v. Wheeler & Wilson Mfg. Co.*, 56 Sickels 205, 209, 101 N.Y. 205, 4 N.E. 264, 266 (1886)). To recover damages for lost profits under New York law, a plaintiff must show that "the allegedly unlawful conduct caused the

economic harm." *Optima Media Grp. Ltd. v. Bloomberg L.P.*, 383 F. Supp. 3d 135, 154-55 (S.D.N.Y. 2019). While "[a] proximate cause determination does not require a jury to identify the liable party as the sole cause of harm," a plaintiff must still show the identified cause is a "substantial factor in bringing about the injury." *Id.* at 155.

Defendants argue Plaintiffs fail to establish damages because CrossBorder (1) did not lose any clients to MGO and (2) failed to produce evidence that Defendants caused clients not to renew. (Defs. Mem. at 19.) Specifically, Defendants do not challenge the amount of damages Plaintiffs allege are due, but rather Plaintiffs' contention that Defendants caused clients to not renew their contracts resulting in damages to Plaintiffs. (Defs. Reply at 10.) Plaintiffs argue they have, at minimum, established the existence of lost profit damages through clients declining to renew their contracts. (Pls. Amend. Mem. at 4.) The parties raise a simple issue of causation—if the jury finds on liability for Plaintiffs, can Plaintiffs prove that Defendants' use of the Master List to solicit clients caused Plaintiffs to lose profits?

Plaintiffs' theory of lost profits is as follows: since 2017, CrossBorder enjoyed a historic client renewal rate of ███ with a three-year client retention period. (*Id.* at 7.) Following the solicitation of more than 200 CrossBorder clients using the Master List, CrossBorder's renewal rate dropped to ██. Specifically, Plaintiffs argue that Defendants' tortious interference caused only █ of the approximately 120 clients up for renewal to renew, resulting in an excess of ███ client non-renewals. That said, Plaintiffs seeks damages for ██ client non-renewals. These █ non-renewals reflect those who (1) were active clients at the time of Defendants' solicitation; (2) decided not to renew within a year of Defendants' solicitation; and (3) have not since returned as CrossBorder clients. The list also excludes clients (1) who failed to pay CrossBorder for services rendered; (2) were written off as bad debts; and (3) whose decision not to renew was reasonably

attributable to other causes. Finally, Plaintiffs only seek damages for excess non-renewals in accordance with its historic ███ renewal rate. Plaintiffs' theory of damages thus rests entirely on the lost profits from the increased non-renewals of contracts, regardless of whether the clients did not renew in order to transition to MGO.

To establish causation, Plaintiffs rely on the "precipitous drop" in the client non-renewal rate and the lack of an alternative explanation. (Pls. Amend. Reply at 7.) More specifically,



First, the Court questions whether Plaintiffs' calculation clearly and definitely shows a "precipitous drop" in non-renewals. Plaintiffs state that ██ out of approximately 120 clients up for renewal in fact renewed, resulting in a non-renewal rate of ███. This rate is far below Plaintiffs' historic non-renewal rate of ███. However, Plaintiffs' historic non-renewal rate is calculated by dividing the number of contracts that did not renew by the number of the number of renewable contracts. (Defs. 56.1 ¶¶ 121-122.) However, before conducting that calculation, Plaintiffs first exclude from the number of renewable contracts those contracts considered non-renewable— including (1) projects considered "one-off" projects; (2) projects which would not be expected to renew; and (3) clients undergoing a change in control or leadership. (Defs. 56.1 ¶ 121.) Defendants

argue that this improperly inflates Plaintiffs' historic renewal rate by reducing the number of non-renewed contracts. (Defs. Mem. at 20-21.) The Court, however, is more concerned that Plaintiffs failed to accurately calculate the drop in the renewal rate using the same methodology it used to calculate its historic non-renewal rate.

The Court understands that to reach the ███ renewal rate, Plaintiffs divided the number of renewed contracts ███ by the number of total contracts up for renewal (120) without subtracting from the latter those contracts considered non-renewable. Granted, the source of the 120 number is unclear. If the Court's understanding is correct, the ███ percent renewal rate cannot be compared to the historic ███ renewal rate. Defendants produce some evidence to support the Court's conclusion. Three to four of the ███ clients have characteristics that would quality them as non-renewable—notes in the excel spreadsheet used to calculate the renewal numbers indicated ███ was subject to a COVID-19 spending freeze; CrossBorder "███ ███" for ███ CrossBorder "███ ███" due to "███; and ███ was acquired by the company ███. (Defs. 56.1 ¶ 123 (citing 11/14/2023 Israel Dep. Ex. 5).)

In response, Plaintiffs strangely claim that only one client—Plaintiffs do not identify which—qualifies as non-renewable and that their lost profit calculation already accounts for this non-renewable client because they are not seeking lost profit damages from all ██ nonrenewing clients. While this concession certainly raises concerns, it also undercuts Plaintiffs' theory of damages—the precipitous drop in renewal rates. If Plaintiffs fail to establish a precipitous drop, they also fail to establish causation. Relying on the "simple" renewal rate advanced by Defendants—wherein the number of renewals is divided by the number of total accounts—the

drop appears less precipitous. (See Defs. Mem. at 17 (calculating a renewal rate of 50% using this method).)

In fact, Plaintiffs seemingly have conceded that they are seeking damages from clients who have affirmatively stated their non-renewal was due to other factors. Plaintiffs identify the following clients as the ███ non-renewals: ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ (01/19/2024 Israel Decl. ¶ 8.) According to Plaintiffs, these clients were live clients as of April 2020 and chose not to renew within a year of Defendants' solicitation. (Id. ¶ 9.) That said, third-party subpoenas revealed that ██████████████████████ declined to renew for reasons unrelated to MGO's solicitation. (02/02/2024 Strach Decl. Ex. 3 (email from ████████ stating it declined to renew because it "██████████████████████████"; Ex. 5 (email from ██████████ stating it declined to renew because it "███████████████████████ ████████████████████████").)

Defendants also challenge that the ███ non-renewals were not reasonably attributable to other causes. (Defs. Mem. at 19.) While Plaintiffs are aware of no other explanation, they certainly have not *ruled out* other explanations. Other explanations raised by Defendants are persuasive. First, the non-renewals occurred in the spring and early summer of 2020 when the economy and businesses suffered due to the COVID-19 pandemic. Second, several clients expressed dissatisfaction with CrossBorder's services. (Defs. 56.1 ¶ 124.) Finally, although the Court finds it irrelevant whether CrossBorder lost clients to MGO (*see* Defs. 56.1 ¶ 113) or that MGO received compensation from clients solicited from the Master List (*see id.* ¶ 112), such evidence would

support Plaintiffs' assertion that MGO's solicitation caused the drop in the rate of non-renewals. Otherwise, Plaintiffs fail to raise a theory as to why the solicitation caused clients to decline to renew their contracts if not to transition their business to MGO.

Upon consideration of the evidence, the Court finds Plaintiffs have failed to demonstrate the existence of an injury. The record is insufficient to establish that Defendants' solicitation efforts was a substantial factor in Plaintiffs' alleged loss of profits. Plaintiffs rely entirely on a "precipitous drop" in renewal rates, without addressing or considering other potential causes of the █ non-renewals. Moreover, the Court finds Plaintiffs have failed to prove such drop with reasonable certainty. Even if Plaintiffs had, the evidence points to other reasons for non-renewals, including client non-satisfaction and the COVID-19 pandemic. That Plaintiffs seek damages from clients who have confirmed they declined to renew for reasons unrelated to Defendants' solicitation further supports the Court's conclusion. Accordingly, the Court finds Plaintiffs' theory of lost profits far too speculative to show damages on its tortious interference claim. Plaintiffs' claim for tortious interference of contract is therefore dismissed.[16]

### B. Tortious Interference with Business Relations

To establish their claim for tortious interference with business relations, Plaintiffs must demonstrate that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171 (2d Cir. 2004) (internal quotation marks omitted); *accord Kirch v. Liberty Media Corp.*, 449 F.3d

---

[16] Plaintiffs rely on the same theory of damages for its DTSA claim. (*See* Pls. Amend. Reply at 4-5; Defs. Opp. at 10.) Accordingly, Plaintiffs are not entitled to damages under the DTSA. 18 U.S.C. § 1836(b)(3)(D); 18 U.S.C. § 1836(b)(3)(B) (stating a court may award damages for "actual loss" and "unjust enrichment," or for a "royalty for the . . . unauthorized disclosure or use").

388, 400 (2d Cir. 2006); *see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,* 813 F. Supp. 2d 489 (S.D.N.Y. 2011).

A tortious interference with business relations claim requires "more culpable conduct on behalf of a defendant" than a tortious interference with contract claim. *Glob. Packaging Servs., LLC v. Glob. Printing & Packaging*, 248 F. Supp. 3d 487, 494 (S.D.N.Y. 2017). For the latter claim, a showing of deliberate indifference may be sufficient to hold a defendant liable. *Id.* In contrast, Plaintiffs must show that Defendants' conduct "amount[s] to a crime or an independent tort" to state a claim for interference with business relations. *Id.* Plaintiffs may satisfy this element by showing that Defendants "interfered through 'dishonest, unfair, or improper means' that amount to misconduct constituting either a crime or an independent tort." *Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.*, 515 F. Supp. 2d 298, 318 (N.D.N.Y. 2007) (citing *Carvel Corp.,* 3 N.Y.3d at 190, 785 N.Y.S.2d 359, 818 N.E.2d 1100)).

Plaintiffs assert claims for interference of business relationships with (1) Song and Tian pursuant to their employment contracts and (2) over 200 transfer pricing customers MGO solicited. (Pls. Opp. at 22.) Plaintiffs argue summary judgment is appropriate because Defendants "interfered with those business relations, with the purpose of unlawfully seizing CrossBorder's trade secrets, clients, and employees, causing injury to those business relationships." (*Id.* at 22-23.) Specifically, Plaintiffs argue Defendants caused CrossBorder to lose clients and two employees and to incur costs to retain its client base. (*Id.* at 23.) Defendants seek summary judgment on the grounds that Plaintiffs fail to adduce evidence of a (1) business relationship with every client on the Master List; (2) any *specific* business relationship they interfered with and allegedly harmed; or (3) that Defendants intentionally acted with malice, for a wrongful purpose, or via wrongful means. (Defs. Mem. at 22-24.)

The Court finds summary judgment in favor of Defendants appropriate. Plaintiffs fail to point to any evidence of wrongful purpose or wrongful means, or to substantively address this argument. The record lacks any definitive evidence regarding MGO, Agarwal, or Hoy's intent, and at most indicates that they were acting in their own economic interests. Plaintiffs have adduced no evidence that Defendants acted for a wrongful purpose, or used dishonest, unfair, or improper means. (*See* Defs. Mem. at 13.) Plaintiffs' Reply completely fails to address this argument when Defendants raise it in their Opposition to Plaintiffs' motion for summary judgment. In their Opposition, Plaintiffs argue that Defendants lacked any economic justification for soliciting clients using the Master List. (Pls. Opp. at 24 n.8.) This conclusory statement, with no evidentiary support, is insufficient to establish this element of the claim. Accordingly, the Court dismisses Plaintiffs' tortious interference with business relations claim.

## CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment and DENIES Plaintiffs' Motion for Summary Judgment. Specifically, the Court dismisses Plaintiffs' tortious interference with contract and business relations claims.

The Parties are directed to appear for a telephonic pre-trial conference on September 14, 2024 at 11:00 AM. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting number: (877) 336-1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest. The Clerk of Court is directed to terminate the motion at ECF Nos. 313, 314, and 317 and to place this Opinion & Order under seal, accessible only to the Court and the parties to the action. SO ORDERED.

Dated: August 19, 2024
      White Plains, NY                                    _____
                                        NELSON S. ROMÁN
                               United States District Judge